314 METCALFE'S REPORTS.

Fry's executor vs. Lexington and Big Sandy Railroad Company.

CASE 68—PETITION EQUITY—OCTOBER 8.

# Fry's executor vs. Lexington and Big Sandy Railroad Company.

### APPEAL FROM GREENUP CIRCUIT COURT.

1. In subscribing for stock in a railroad company, the charter of which creates and defines the terms of the contract between the company and the stockholder, it is only necessary that the writing should indicate the intention to become a stockholder, and the number of shares that are taken by the subscriber. The taking of stock creates a contract to pay for it in the mode prescribed by the charter, and a stipulation to that effect in the subscription paper is not necessary.

2. The heading of a subscription is as follows: "Railroad stock taken at Catletts-burg, Ky., in Lexington and Big Sandy R. R. company, May 12th, 1852." Under-neath are written the names of the subscribers and the number of shares subscribed by each. One of them, who acted as a stockholder in the election of directors, and made partial payments on his stock after the company organized, is sued for the unpaid balance of his subscription. *Held*—That he was legally a stockholder in the company.

3. Where the directors of a railroad were authorized by the charter to vary the route and change the location of the road whenever a cheaper or better route could be had—a change of location which placed the road upon a cheaper route, and pro-cured a large additional subscription of stock, and also furnished a reasonable proba-bility that the business and profits of the road, when finished, would be thereby consid-erably augmented, does not exonerate the subscribers from the payment of their stock.

4. Nor are subscribers living at and owners of real estate in a town, made by the charter the terminus of the road, exonerated from the payment of their stock because such change of the location of the road will build up a rival town several miles dis-tant, and that their town will be injured thereby.

5. Amendments of the charter of an incorporated company which are necessary to carry into effect its main design, may be made without the consent of a shareholder. But an amendment which materially and fundamentally changes the responsibilities and duties of the company, or which superadds an entirely new enterprise to that which was originally contemplated, may be resisted by the stockholders, unless such amendments are provided for in the charter itself, or in the general laws of the State in force at the time the act of incorporation was passed.

6. Subscribers who do not assent to such amendment may prevent the company from proceeding to act under it, and embarking in enterprises not contemplated by the orig-inal charter; or permit the company to proceed under the amended charter, and dissolve their connection with the company upon equitable terms. But the mere passage of the amendment, conferring such additional powers upon the company, which it has not attempted, and may never attempt, to exercise, does not operate *per se* to exonerate a shareholder from liability to pay his subscription.

7. Where a given amount of capital stock is required to be subscribed before a cor-poration, by the terms of its charter, is authorized to go into operation, it is neces-sary, in an action by the company against a stockholder to recover the amount sub-scribed by him, that the petition should allege that the requisite amount of stock had

Fry's executor vs. Lexington and Big Sandy Railroad Company.

been subscribed before he was called upon for the amount of his subscription; and the failure to make such averment may be relied upon for reversal, although the question was not made in the circuit court.

W. H. Wadsworth and E. F. Dulin, for appellant, cited 3 *Strob.*, 245; 18 *Barb.*, 297; *Ib.*, 310; *Pierce's Amer. R. R. Law, pp.* 61, 72, 79; *Redfield on Railways, pp.* 6, 7; *Sess. Acts* 1851-2, 780; 26 *Pennsylvania*, 69; *Willett vs. Maysville and Lexington R. R. Co., MS. opin., summer term*, 1858; 16 *B. Mon.*, 6; 2 *Gray*, 278; 6 *Pick.*, 23; 9 *Ib.*, 187; 6 *Cush.*, 50; 8 *Ib.*, 110; *Redfield on Railways, pp.* 37-8, *sec.* 30; *Ib., pp.* 74, 77, 78, 79, 80, 81; 10 *Pick.*, 143; 39 *Maine*, 573, 582; 6 *Pick.*, 45; 10 *Ib.*, 146; 1 *N. H.*, 44; 8 *Mass.*, 268; 10 *Ib.*, 384; 5 *Hill*, 383; 18 *Barb.*, 312; 11 *Geo.*, 438; 1 *Am. Law Reg.*, 154; *Redfield on Railways*, 90, 91-2-3-4-5-6, *and notes*; 1 *Stockton's Chancery*, 401; *Sess. Acts* 1853-4, *p.* 8.

K. Farrow, for appellee, cited 15 *N. Y. Rep.*, (1 *Smith*,) *pp.* 47, 48, 50, 64, 65; *Pierce*, 94, *and note*; *Ib.*, 59, 60, 57, 61, 62, 63, 84, 85, *and note; Western Law Monthly, January*, 1859, *pp.* 31 *to* 39.

B. J. Peters, on same side, cited *Civil Code, sec.* 12; 16 *B. Mon.*, 363; *Ib.*, 6, 7; 2 *American Railway Cases, pp.* 3, 8, *&c.*; *Sess. Acts* 1851-2, *pp.* 780-1-2-3; *Pierce's R. R. Law, pp.* 83, 84, *and cases there referred to; Redfield's Law of Railways, pp.* 70, 93, 94, 95, 96, 97, *note* 1.

R. Apperson, on same side, cited 16 *B. Mon.*, 4, 6; *Angell & Ames on Corporations, secs.* 499, 518, 519, 517; 4 *Sneed*, 518; *Ib.*, 545; 1 *Caine's R.*, 381; 14 *Wendell*, 20; *Buffalo and N. Y. City R. R. Co. vs. Dudley, decided by Court Appeals of N. Y.*, 1858; *Angell & Ames on Corporations, secs.* 474, 476; 16 *Mass. R.*, 94.

D. K. Weis, on same side, cited *Pierce on Railroads, pp.* 56, 57.

CHIEF JUSTICE SIMPSON delivered the opinion of the court:

This action was brought by the Lexington and Big Sandy railroad company against James W. Fry, since deceased, to compel him to pay the unpaid balance upon seventy shares of stock which the plaintiff alleged he had subscribed for on the books of said company.

Several grounds of defense are relied upon, each of which we will notice in its regular order.

The subscription, it is contended, was not made in conformity with the requirements of the charter, nor in such a manner as to impose any obligation upon the subscribers.

The original subscription has been lost. A copy thereof, certified by the commissioners who were appointed by the charter to receive subscriptions to the capital stock of the corporation, was produced, the heading of which is as follows:

"Railroad stock taken at Catlettsburg, Ky., in Lexington and Big Sandy R. R. company, May 12th, 1852."

The names of the subscribers, and the number of shares subscribed by each one of them, are written underneath, and among the names so written is that of the defendant, James W. Fry, having seventy shares, amounting to thirty-five hundred dollars, annexed to his name.

Fry, in his answer, did not deny that he subscribed for seventy shares of stock, but alleged that "the paper upon which his name was written was not such a writing as the act of incorporation required to bind him as a stockholder or subscriber of stock to said road."

It is evident, from the statements contained in the defendant's answer, that he supposed it was necessary, under the charter, that there should have been some promise or agreement in writing on the part of the subscribers to pay to the company the amount subscribed by them in stock, otherwise they were not responsible for their subscriptions. No such promise, however, is required by the charter. It authorized the commissioners therein named to open books at such places as they might deem fit, and to receive subscriptions to the capital stock of said company. The subscriber was to pay to the commissioners the sum of two dollars on every share subscribed by him, and the residue thereof was to be paid in such installments, and at such times, as might be required by the president and directors of said company.

It is usual for subscriptions of stock to be made underneath a writing containing a stipulation that the subscribers are to pay the sums annexed to their names, as they may be required by the president and directors of the company; but such a stipulation is not necessary under a charter like this, in

which the terms of the contract between the company and the stockholder are created and defined by the act of incorporation itself. In subscribing for stock, it is only necessary that the writing should indicate the intention to become a stockholder, and the number of shares that are taken by the subscriber. The taking of stock in a corporation creates a contract, express or implied, to pay for it, in the mode prescribed in the charter.

The fact that Fry subscribed for seventy shares of stock in this company is clearly and fully established by the testimony. And it also appears that he considered himself a stockholder, acted as such in the election of directors, and made partial payments on his stock after the company had been organized. That he was properly and legally a stockholder in the company is, therefore, a matter about which no doubt can exist.

After the line of the road had been located by the directors of the company, it was changed, and placed by them on a different route; and this alteration in the line of the road is relied on as sufficient to exonerate the subscribers from the payment of their stock.

When the line of a road has been once actually fixed, the power to make an essential alteration therein may not exist, unless it be conferred by the charter. But even where it is not authorized by the charter, the alteration, to have the effect of exonerating the subscribers for stock, must be one which removes the inducement to subscribe, or else changes essentially the duties and responsibilities of the company. Such an effect cannot be produced by an alteration which is immaterial, or which does not operate to the prejudice of the stockholders.

The power to make the alteration in the line of this road was, however, conferred on the directors by the charter. It is provided in the tenth section thereof, that "if said directors, after having selected a route for said railway, find any obstacle to continuing said location, either by the difficulty of construction or procuring right of way at reasonable cost, or whenever a *cheaper* or *better* route can be had, they shall have authority to vary the route and change the location." The alteration complained of was fully authorized by this provision in the char-

ter. It placed the line of the road on a *cheaper* route, as is proved by the testimony, and also procured for the company an additional subscription of stock, to the amount of two hundred thousand dollars. The change was, therefore, manifestly advantageous to the stockholders in the aggregate, and tended to promote the general interests of the company.

It is said, however, that the alteration of the line of the road removed the prevailing motive for the subscription of stock on the part of Fry, and was, in fact, a violation of the agreement or understanding under which his subscription was made.

. It appears that Catlettsburg is a town situated on or near the Ohio river, at the mouth of Big Sandy. Fry was the owner of a large real estate in and adjoining said town, and was, therefore, interested in its growth and prosperity. He alleged in his answer that he agreed to take stock, under the belief, which was created by the commissioners and other agents of the company, that Catlettsburg would be the Ohio river *terminus* of said road; and that it was made so by the original location of the road; but by the alteration the town of Ashland, which is situated on the Ohio river several miles below the mouth of Big Sandy, was made the Ohio river *terminus*, whereby the object he had in view in subscribing for stock was completely frustrated and defeated.

The commencement and termination of the road were both fixed by the charter. It was to "commence at any eligible point in or near the city of Lexington, in Fayette county; thence by the most practicable route to the mouth of Big Sandy." The company had a discretion as to the selection of intermediate points, but could not alter the place at which the road was to terminate. And as the town of Catlettsburg is situated at the mouth of Big Sandy, the representations which were made that Catlettsburg would be the the Ohio river *terminus* of the road, were true. It was made the terminus by the charter, and was always so treated and regarded by the company. The alteration complained of did not make the road terminate at a different point, but only made it approach its termination by a different route than the one that was first selected.

An effort was made to prove that some letters which were written by a friend of the enterprise to induce the citizens of

Catlettsburg to subscribe for stock, contained a statement that the road would not touch the Ohio river until it reached its terminus. But this was evidently an after thought. Where the road would first touch the Ohio river was not a subject of discussion at the time the subscription was made. Fry did not allege in his answer that any representations had been made in relation thereto; and it appears from the testimony in the cause, that several different routes were spoken of at the time, by some one of which it was supposed the road would approach the town of Catlettsburg, but by which one of them no person pretended to know. Among the routes thus mentioned, there was one running up the Ohio river, and adjacent thereto, from which it is manifest that it was not then regarded as a matter of any consequence whether the road *first* touched the Ohio river at the mouth of Big Sandy, or at some point below that place. Nor does the evidence prove that the letters referred to contained any such representation. One witness testified on the subject, but he said "that he could not state positively whether the statement contained in the letters was, that Catlettsburg would be the point at which the road would first strike the river, or that Catlettsburg would be the terminus of the road." Another witness concurred with him, and adopted his deposition. We are satisfied, however, that the only representations which were made, were to the effect that Catlettsburg would be the *terminus* of the road, and for that reason its citizens were deeply interested in its construction.

But it is contended that Fry, as well as the other citizens of Catlettsburg, subscribed for stock under the belief that the road would contribute largely to the growth of the place, and increase very greatly the value of the real estate there situated; and that by the alteration of the line of the road from its first location, the rival town of Ashland will be built up, to the injury of Catlettsburg, whereby great injustice will be done to the subscribers of stock who own real estate in the latter place.

It does not certainly appear from the testimony that the town of Catlettsburg will be injured by the building up of the town of Ashland. The witnesses differ widely in their opinions on the subject. But conceding that such will be the consequence,

and that the town of Ashland owes its existence exclusively to the alteration which the directors made in the line of the road, it does not follow that the subscribers are thereby exonerated from the payment of their stock.

The directors were authorized by the charter to vary the route, and change the location of the road, whenever a cheaper or better route could be had. The change which was made was obviously beneficial to the company. It not only placed the road upon a cheaper route, and procured an additional subscription of stock to the amount of two hundred thousand dollars, but it also furnished a reasonable probability that the business and the profits of the road, when it should be finished, would be thereby considerably augmented. In every such enterprise the interest of the few must yield to the greater interest of the many. Each stockholder may desire to advance some particular object, or to promote in some way his own individual interest; but it is the duty of the directors to adopt such measures as will be most advantageous to the stockholders in the aggregate, and as are best calculated to further the purposes for which the company was incorporated. In doing this, the special object of some of the subscribers may be thwarted or defeated; but as this results from the very nature of the enterprise in which they have thought proper to embark, it furnishes them with no just cause of complaint, much less does it entitle them to claim an exemption from the payment of their stock.

An effort was made to show that Fry's subscription of stock was conditional, but what the condition was is not alleged; and according to the testimony, the stock was subscribed without any condition, either verbal or written. An effort was also made to prove that the directors, in altering the line of the road, were actuated by improper and interested motives. But it is clearly proved that none of them had any interest in the town of Ashland at the time the change was adopted; and all the facts and circumstances show that in making the alteration they acted in *good faith*, with a view to promote the interests of the company, uninfluenced by any other motive whatever.

In March, 1854, an act was passed by the legislature, entitled "An act to amend the charter of the Lexington and Big Sandy railroad company." (2 *Session Acts* 1853–4, *p.* 8.) By some of the provisions of this amended act such modifications of the charter are made as are merely auxiliary to the original design, and necessary to carry it into complete effect. Other provisions of the act, however, are calculated to produce a radical and fundamental change in the charter, and to superadd thereto an entirely new object, thereby materially varying the original character of the enterprise. Of the latter description are those which authorize a consolidation of this with other roads, either in or out of this State, and those which authorize the company to subscribe in their corporate capacity for stock in any railroad company, or any other improvement which, in the judgment of the president and directors, will promote or redound to the interest of the company, as well as those which authorize the company to construct and use a railroad in other States.

The executor of Fry, by an amended answer, averred that the company, without the assent of his testator, had procured the passage of said amended charter, thereby conferring powers and authorizing the assumption of responsibilities different from what existed at the time the subscription was made, and contended that by so doing he was released from all liability for the stock subscribed.

Each shareholder in an incorporated company has a right to insist on the prosecution of the particular objects of the charter. He cannot be deprived of his rights or privileges without his assent. Such alterations of the charter as are necessary to carry into effect its main design, may be made without his consent. But an alteration which materially and fundamentally changes the responsibilities and duties of the company, or which superadds an entirely new enterprise to that which was originally contemplated, may be resisted by the stockholders, unless such alterations are provided for in the charter itself, or in the general laws of the State in force at the time the act of incorporation was passed.

The charter of this road contains no provision authorizing amendments to be made, nor was there any general law in force at the time it was granted by which they were authorized. The subscribers, therefore, who do not assent to the amendment have the right, if they think proper to exercise it, to prevent the company from proceeding to act under the amended charter, and to compel it to confine its operations solely to the promotion of the objects designed to be accomplished by the original charter. Or they may waive this right, permit the company to proceed under the amended charter, and dissolve their connection with it upon equitable terms. Being members of the corporation, they are entitled to all the rights and privileges conferred by the charter, of which they cannot be deprived by the act of the company in accepting an amendment to which they are opposed, and which ·produces a material and radical change in their rights, and in the duties and liabilities of the company.

But none of the stockholders are injured by the mere passage of the act of the legislature amending the charter. Unless the company shall adopt the amendment, and proceed to act under it, the subscribers have no just cause of complaint. The defendant did not allege in his answer that the company had done anything indicating an intention to act under it, or that it was attempting to collect the balance due upon the subscription, to use it for other purposes than such as were authorized by the original charter. It was alleged in the answer that the company had procured the charter to be amended; but as the amendment, so far as it will operate to alter the original charter fundamentally, merely confers an authority on the directors which they may or may not exercise at their discretion, and the exercise of which, to render it valid, must be approved by a majority of the stockholders, it is apparent that no injury can result to any stockholder from the mere passage of the act amending the charter. The company may never attempt to avail itself of any of the provisions contained in the amended charter which authorizes it to embark in other enterprises besides those that were contemplated in the original charter; and if it should, any stockholder will have

Fry's executor vs. Lexington and Big Sandy Railroad Company.

it in his power to prevent it from doing so. An amendment of a charter which, like this one, merely confers additional powers upon the company, which it has not yet attempted, and may never attempt, to exercise, does not operate, *per se*, to exonerate a shareholder from liability to pay his subscription. He is not injured by the amendment whilst it remains inoperative. The company may never avail itself of its provisions, or attempt to carry any of them into effect. If it continues to act under the original charter, which it has a right to do, notwithstanding this amendment, no shareholder has any just cause of complaint. And if it should avail itself of such of the provisions contained in the amendment as are calculated to aid in the accomplishment of the original undertaking, and are entirely consistent therewith, it will have the right to do it. Every stockholder in a company which is organized for the purpose of constructing a railroad, comes under an implied agreement that such amendments may be made to the charter as may be required to carry the original design into complete effect. The corporation still has lawful power to execute the primary object of its creation; and if it should not attempt to use the means of the shareholders for any other purpose, they cannot claim to be absolved from their obligations to pay the amount of their subscriptions.

An objection is made to the plaintiff's petition, on the ground that it fails to aver that the amount of capital stock required by the charter to be subscribed before the corporation could go into operation, had been subscribed before Fry had been called upon for the payment of his subscription.

Where a given amount of stock is required to be subscribed before the corporation is authorized to go into operation, this requisition must be regarded as an indispensable condition precedent. Each subscriber undertakes to pay the amount of his subscription only in the event and upon the condition that the whole amount of capital stock required by the charter to enable the company to organize and commence operations in its corporate capacity, shall be subscribed.

By the charter of this road, the company were authorized to go into operation whenever one hundred thousand dollars or

324        METCALFE'S REPORTS.

Fry's executor vs. Lexington and Big Sandy Railroad Company.

more should be subscribed to the capital stock, but not until that amount was subscribed. The capital stock of the company was one million of dollars, to be increased, if necessary for the completion of the road. But whenever stock to the amount of one hundred thousand dollars was subscribed, the company could organize and go into complete operation.

The question then is, was it necessary for the plaintiff to allege in the petition that the requisite amount of stock had been subscribed before Fry was called upon for the payment of his subscription, or if that amount of stock had not been subscribed, was it incumbent on the defendant to avail himself of that fact by way of defense to the action?

This question does not appear to have been made in the circuit court; still, however, if, to enable the plaintiff to maintain the action, it was necessary that the petition should contain an averment that the requisite amount of stock had been subscribed, the failure to make such an averment renders the petition defective, and the defect is such a one as may be relied upon for the reversal of the judgment.

It is a well settled rule of pleading, that the plaintiff must aver the performance of all conditions precedent in the contract when the liability of the defendant is dependent on their performance. Without such an averment, no cause of action is shown to exist. In this case the liability of the defendant depends upon the fact, whether a subscription of one hundred thousand dollars had been obtained when his intestate was called on to make payments on his stock. Unless a subscription to that amount had been obtained, he was not, according to the implied terms upon which he became a stockholder, liable upon his subscription. As the petition must state all the facts necessary to show a cause of action against the defendant, and as the fact that stock to the amount of one hundred thousand dollars had been subscribed is one that is indispensable for that purpose, the failure to aver it renders the plaintiff's petition fatally defective.

Wherefore, for this error the judgment is reversed, and cause remanded that the plaintiff's petition may be amended, and for further proceedings consistent with this opinion.