JUDGE PRYOR
delivered the opinion oe the court.
The legislature of Kentucky, on the 17th of February, in the year 1846, incorporated the Covington & Cincinnati Bridge Company for the purpose of constructing a bridge across the Ohio River between the cities of Covington and Cincinnati. The corporators were James Goodloe, Geo. Carlisle, E. Foote, and others, all of the city of Covington. They were vested with the ordinary rights and privileges pertaining to such a corporation, but were not permitted to organize or open their books for the subscription of stock until after the confirmation of the act of incorporation by the state of Ohio. The legislature of that state, on the 26th of March, 1849, confirmed the act of the Kentucky legislature by conferring upon the company similar powers, with some amendments thought necessary to guard the interests of the latter state.
The original capital stock of the corporation was only three hundred thousand dollars, which was afterward increased to one million. The company undertook the execution of the work, and in a short time expended about three hundred thousand dollars, the amount of the original capital, leaving as the only available means for continuing its prosecution about the sum of one hundred thousand dollars. It was soon apparent to all the parties interested that the cost of this structure would *74 greatly exceed its capital stock. The company had expended all of its means, and was in such an embarrassed condition as not only caused a delay in the prosecution of the work for several years, but the structure itself, or the ground upon which its pillars were erected, was about to be subjected to the claims of creditors.
Amendments had been obtained to its charter from the legislatures of both states, authorizing the company to borrow money and pledge the bridge for its payment. The appellant (the city of Covington), being directly and vitally interested in the success of the enterprise, in pursuance of an act of the legislature, had already made a subscription of one hundred thousand dollars to the capital stock, paying of this sum ten thousand dollars in money, and issuing the bonds of the city for ninety thousand dollars, which were received by the company at par and in full discharge of the amount subscribed.
In order to relieve the company from its embarrassed condition and to insure the completion of the work the legislature of this state, in the year 1861, authorized the company to receive subscriptions for five hundred thousand dollars, or one half of its capital stock, in preferred stock, “ and to pledge its revenues for the payment of the dividends on the same,” this stock “not to be preferred to the extent of more than fifteen per cent per annum.” The same right was afterward given the company by the state of Ohio. Whether this preferred stock should be issued or not was by this amendment to be determined by a majority of the non-preferred stock subscribed and paid for.
By an additional amendment, approved January 21, 1865, the capital stock of the company was again increased, and the company authorized to issue additional preferred stock to the amount of two hundred and fifty thousand dollars, the previous stockholders to have the preference in taking this stock for thirty days after the opening of the books — the acceptance *75 of the provisions of the amendment to be determined by a vote of the majority of the stock represented at a meeting called for that purpose.
The legislature of Ohio passed an act on the 16th of March, 1865, authorizing all companies incorporated for the purpose of constructing bridges across the Ohio River to increase their capital stock, and to prefer such increased stock to' the extent of fifteen per cent, provided that “ before subscriptions shall be received to such preferred stock the stockholders shall have approved the same at a regular or called meeting for that purpose, and a majority .of the stockholders shall be necessary to give such authority,”
Meetings of the stockholders were held under the amended acts of 1861 and 1865, and the preferred stock taken. The bridge was completed in the month of January, 1867, at a cost of one million eight hundred thousand dollars; and the company having declared two dividends, that were paid to' the preferred stock, excluding the original and non-preferred stockholders, the city of Covington, being one of the latter class, instituted this action to recover its share of the dividends, etc. The preferred stockholders being made defendants, and having received no greater dividends than the amended acts authorized, deny the right of the city of Covington to any portion of the dividends paid them.
The court below refusing any relief, it is maintained by the appellant on this appeal — first, that these amended acts impair the validity of the contract between the original non-preferred stockholders and the company; second, that they are in violation of article 13, section 1, of the Ohio Constitution, which provides that “the General Assembly shall pass no special act conferring corporate powers,” that the charter, being a compact or agreement between the two states, can not be amended without the consent of both, and the issue of preferred stock being illegal in Ohio, is therefore of no validity in.Kentucky; *76 lastly, that the stockholders never accepted the amendments in the form and manner required, the majority of the stock and stockholders not voting therefor.
The power of the legislature to amend the charter authorizing the issuing of preferred stock will be first considered. It is settled by an unbroken chain of authority that the charter of a private corporation may vest such rights in the corporators and stockholders that no subsequent legislation can impair or diminish, and it is equally as well settled that such amendments of a charter may be made as are necessary to carry into effect or accomplish the purposes for which the charter was obtained. (Fry’s ex’r v. Big Sandy & Lexington Railroad Company, 2 Met. 321.)
In the present case the company, when originally organized, had only a capital of three hundred thousand dollars to construct a bridge that cost nearly two millions. The capital of the company having been expended, it was evident that without the addition of some available means the stock already taken must not only be sacrificed, but the enterprise itself prove a failure. It was necessary therefore to raise money, either by mortgaging the corporate property to secure its payment or issue preferred stock, in order to enable the company to complete the work.
The business affairs of a corporation, unless restricted by the act creating it, are always subject to the controlling interests, and the general rule that the majority governs applies. The rights of the original stockholders were fully protected in both amendments, by first requiring the consent of a majority of the non-preferred stock to the provisions of each, and in giving to them the right within sixty days from the opening of the books to take all the preferred stock. If the company has complied with the requirements of the amendments before issuing the preferred stock, we see no constitutional objection to the passage of either act. The power of the legislature *77 to enable the company to borrow money by mortgaging the whole of the corporate property to secure it must be conceded. All the corporate property by this character of legislation is made subject to the claims of the mortgagee, and even the franchise itself (if embraced within its terms) is liable to be sold to satisfy the debt it was intended to secure. The right to the franchise and its use passes, under such a sale, from the original stockholders into the hands of the purchaser, depriving those making the original investment not only of the right to dividends, but results in the complete loss of the stock itself. The issuing of preferred stock, with the dividends to be first applied as provided in the amendments, is only a means of enabling the company to pledge the revenue of the corporation to obtain money, instead of pledging the franchise; the only distinction being that in the latter case the franchise itself, or the rights therein, may pass from the stockholder, while in the former, although the payment of the dividends may in eifect lessen the value of the non-preferred stock, yet the last-named stockholders have left them a voice in the control and management of the corporation, with the right to share the profits when the dividends to the preferred stock have been paid.
The necessities of corporations on account of pecuniary embarrassments, like individuals, must occasionally require a pledge of the corporate property in order to raise money, and it would be unwise legislation, when a majority of the stock demands this relief, to deny a grant of power that if withheld must result in the entire loss of the corporate property. The proposition made to the public by the company that preferred stock could be taken was an inducement to those who desired to make such investments to subscribe therefor, and thus enable the company to progress with this great improvement to its completion. This preferred stock amounted to seven hundred and fifty thousand dollars, and by its payment the *78 original stock, already worthless, is enabled to participate in controlling the corporation, and the bridge is completed.
If these enactments were even regarded as unconstitutional, the chancellor, after the payment of the money on such a pledge, and the success of the enterprise by reason of this large expenditure, induced by the action of the corporation and sanctioned by an attempted exercise of legislative power, would hardly refuse his aid in enforcing its collection by subjecting the property to its payment. (Eberhart v. Westchester & Philadelphia R. R. Co., 28 Penn. 339; Bates v. The Androscoggin & Kennebeck R. R. Co., 49 Maine, 492; Rutland & Burlington R. R. Co. v. Thrall, 35 Vt. 536.)
The authority relied on by counsel for appellant seems tó us to have but little analogy tó the questions involved here: The legislature of Ohio passed an act “authorizing all such turnpike companies as might accept the provisions of the act to issue bonds to pay for building their roads, and make the stockholder individually liable to the amount of their stock for the payment of the bonds.” The courts of that state held very properly that the act was unconstitutional. Such an act certainly impaired or changed the character of the contract between the company and the stockholder. The latter was in no sense the owner of the corporate property, and could not without his consent have been made individually liable for the corporate debts. If the proceeds of the road had been pledged to pay a corporate debt by legislative enactment, there could have been no question as to its validity under the law of that state. Nor do we understand, although these amendments may be in violation of the 13th article of section 1 of the Ohio Constitution, that the rights of these stockholders can be affected by it. It is conceded that corporations created by one state can exercise no corporate powers within the limits of another state without the consent of the latter; but when this consent is obtained the fact that án ámendmén't to' thé *79 charter of a corporation by the state creating it is in conflict with some law or constitutional provision of the state licensing the corporation to exercise certain powers within its limits can not be held to destroy its validity.
The legislature of Kentucky had the power to create this corporation, but could not invest it with the right to construct any part of its bridge on the soil of Ohio, and recognizing this fact required the corporators to obtain an act of the Ohio legislature confirming the act of incorporation. This state had not only the power to make the grant, but to give it all the rights and powers the legislature saw proper when not in violation of the state or Federal constitution; but when attempting to exercise these corporate rights within the boundary of another state it must be done with- regard to the laws of that state. This is essentially a Kentucky corporation, created three years prior to the act of confirmation or the enabling act passed by the legislature of Ohio. The corporators, as the act recites, were all citizens of the city of Covington, the place where its elections wTere held, its dividends declared, and its business office located.
The action of the legislature of the two states with reference to this charter created no compact or agreement by which like legislation must be obtained from each state before any amendment could be made to the original charter or additional power given the corporation, and we perceive no reason for disregarding the amendments when not in violation of either the constitution or laws of the state. When these corporate powers are attempted to be exercised in Ohio the constitutional question can be made, and even if the views of appellant’s counsel are correct — viz., that this corporation is the creature of both states — still, if a mortgage or pledge created by the corporation on the corporate property within this state is made in accordance with the laws of the state, we are not disposed to concede that the Ohio courts would deny the validity of such a contract.
*80 In the case of the Railroad Company v. Harris (12 Wallace S. C. U. S. 65) the Baltimore & Ohio Railroad Company was incorporated by the legislature of Maryland, and on the 8th of March following the Virginia legislature passed an act whereby, after reciting the Maryland act, it was declared that “ the same rights and privileges shall be and are hereby granted the company within the territory of Virginia.” It was held that this act, as well as other amendments passed by the latter state, created no new corporation, but was only a permission or license by Virginia enabling the Maryland corporation to enlarge its operations.
It is urged by appellant that the amendment of 1861 was never accepted by the company; that it was not voted for by a majority of the non-preferred stock “subscribed and paid for.” It becomes therefore necessary to determine whether the vote east by those representing the stock of the city of Covington was authorized. If so, there was a majority vote favoring the amendment.
On the 12th of April, 1861, the city council of Covington passed a resolution directing its president and the chairman of the committee of ways and means to attend the meeting to be held by the bridge company and cast the vote of the city. This meeting was for the purpose of accepting or rejecting the amendment. Wm. Ernst, the president of the council, and I. Wilcox, the chairman of the committee on ways and means, were present when the vote was taken, and the record of the stockholders of the bridge company shows that one thousand votes were cast in the name of the city for the amendment by Wm. Ernst. The evidence shows that Wilcox was also present and concurred in this vote, although there is no record of the fact, nor is there any evidence of record in the proceedings of the city council showing that this vote of Ernst was approved, or that any direction was given these agents by the council how the vote should be cast; but the evidence is abundant that *81 the vote was given in accordance with the wishes of the council. This municipal corporation through its council had the power to appoint some one to cast the vote of the city for or against the amendment. It would have been altogether impracticable for the whole council to have attended and given a united voice for or against the measure. The charter of the bridge company authorized the vote by proxy, and in casting such votes corporations must necessarily, in most instances, act-by an agent.
It is said in Angelí and Ames on Corporations (page 313) “that in the acceptance of an official bond by a corporation so as to bind the sureties the recording of the vote of acceptance or approval is not essential to its validity unless the charter or by-laws expressly made it so. Neither is it indispensable to show a written instrument or vote of acceptance of a charter or written enactment on the corporation books, all which may be inferred from the acts of the corporation through its officers or otherwise. Upon the same principle it seems clear that a vote or resolution appointing an agent need not be entered on the minutes unless the charter renders it essential. A board, says Mr. Justice Story, may accept a contract or approve a security by vote or by tacit and implied assent.”
Parol evidence may be introduced to show the vote or assent unless the charter forbids it. There is no reason why an agent of a corporation acting within the scope of his authority may not bind his principal in the same way as if he was the agent of a natural person. There is in fact no distinction, unless the act of incorporation expressly prescribes the contrary. In this case it is an undisputed fact that the council -was in favor of this amendment, and that their appointed agents voted for it; but for the reason that the council failed to make a record of the manner in which the vote was to be cast, and of the bridge company to note the assent of Wilcox to the vote *82 cast by Ernst, it is maintained there was no valid acceptance of the amendment by the city of Covington.
The authority already referred to is a complete response to the position assumed by counsel. It also appears that after the acceptance of the amendment of 1861 the preferred stock was taken, and the work, once abandoned, again renewed and prosecuted to completion within the limits of the. city where this complaint is made. The city continued to vote and participate in the business affairs of the company, and in 1865 again voted by the president of its council for the acceptance of that amendment, the record of the vote showing that nearly the entire stock voted for it. It is true there is no authority appearing in the proceedings of the council delegating the right to the president to cast the vote for the amendment of 1865; still the vote, excluding the entire stock owned by the city of Covington, was largely in favor of it, and it might well be maintained that the vote for this amendment was a ratification of the action of the stockholders by which the amendment of 1861 was accepted.
The general law enacted by the state of Ohio prescribing the manner in which such amendments should be adopted can not affect this case, for reasons already indicated. There being no greater dividends than the preferred stockholders were rightfully entitled to receive, the judgment of the court below must be affirmed on the original appeal.
It also clearly appears that the appellee accepted the bonds of the city of Covington at par and in full discharge of the subscription made. The action afterward taken by the council, in which the propriety of additional legislation is suggested for 'the relief of the appellee in the event a loss was sustained in the sale of the bonds, was merely voluntary, and can scarcely be said to evidence the existence of a moral obligation to pay.
The judgment is therefore affirmed on the cross-appeal.