CASE 7—EQUITY—FEBRUARY, 1883.

# Handlin, &c., v. Davis, &c.

APPEAL FROM LIVINGSTON CIRCUIT COURT.

1. An administrator or executor cannot be permitted to speculate upon, or even purchase, the estate confided to him.
2. Neither can an attorney contract with his client in regard to the subject-matter of the litigation.
3. The chancellor, whenever it is to the interest of the heirs, will cancel the purchase, whether realty or personalty is involved.
4. When a claim that is even doubtful is the subject of the sale, equity will not allow an administrator or attorney to profit by his purchase to the injury of the heir.
5. An agreement is made between several persons to form a partnership, and one reserves the right, for a fixed time, to decide whether he will be a partner. *Held*—Although not an actual partner, he has the right to become one within the time specified.

C. BENNETT FOR APPELLANT.

No brief.

J. W. BLUE, MARBLE & SON, AND W. P. D. BUSH FOR APPELLEES.

No brief.

JUDGE PRYOR DELIVERED THE OPINION OF THE COURT.

B. F. Davis died in the county of Livingston, in the year 1878, intestate, leaving no wife or child surviving him, and the owner of valuable personal and real estate. His friends

and neighbors, who had known him for many years, seemed to be entirely ignorant as to his family history, and some of his remote collateral relations were claiming to be his next of kin, and entitled to his estate. On the 26th of September, 1878, T. I. Lay and J. L. Hibbs qualified as administrators of his estate, and took charge of the assets. Some time after the death of Davis the appellants, Handlin and Bush, who were attorneys at law, and who had been employed by the administrators as their attorneys in reference to this estate, ascertained, in some manner, that Davis had relations living in the State of Missouri, who were nearer to him in blood than those in Kentucky, and who would be entitled to the estate if the relationship could be established.

Handlin, under an arrangement with Bush, went to Missouri for the purpose of learning something of Davis' kindred there, and of seeking employment from them as attorneys, or of purchasing their interests in the estate, in the event they were entitled as the next of kin. Handlin found the three appellees living in Ray county, Missouri, and soon ascertained that they were the half brothers and sister of the decedent. They, it seems, had learned from rumor that the decedent had been dead for a great many years, and had lost his life by some accident on the Mississippi river, and when informed by Handlin of the death of Davis in Kentucky, at once recognized the fact that he was their half brother. Handlin made known to them the purpose of his mission, and proposed to accept an employment from them for himself and Bush at a sum equal to one third in value of what could be recovered, or one half, and the attorneys to become liable for all the costs. These propositions they declined to accept, but offered to sell to Handlin and Bush their interest in the estate. Handlin gave to them

the valuation of the estate as it appeared upon the assessor's books, valued at $10,000, and also informed them of the claim of their remote collateral kindred, and the claim that the heirs of Mrs. Davis was setting up against the estate for about ten thousand dollars, with its interest. It was claimed that Swansey, the father of Mrs. Davis, by his will had devised to her for life, and then to his bodily heirs, the sum of ten thousand dollars; that her husband had been made her trustee, and the wife, dying without children, the money passed to the next of kin of the wife. Mrs. Davis had one child prior to her marriage with Davis, that died during infancy, and the question made by her kindred was, that they took the estate and not the husband. The will of Swansey was exhibited, with the belief expressed by Handlin that Davis was the party entitled, and not the heirs of his wife. Handlin seems also to have advised them that it was better for them that he should undertake the case as their attorney than to make the purchase; but after consultation with each other, and perhaps a lawyer of the county, they sold to Handlin and Bush the entire estate for the sum of two thousand dollars, and executed deeds for all the realty.

The estate was worth at the time, from the testimony of the appellants, Bush and Handlin, the sum of $12,000, and from the testimony of the appellees, about the sum of twenty thousand. We think it is about a fair estimate of the value to say it was worth not less than fifteen thousand dollars.

The heirs, appellees, becoming dissatisfied with the contract made, and believing they had been imposed on by Handlin, instituted this action in equity in the Livingston circuit court, seeking to set aside the conveyance of the real

estate, and to annul the entire contract. It is alleged in the petition, that shortly after Hibbs and Lay were appointed administrators, Handlin, Bush, and the administrators entered into an agreement to raise money and purchase from the heirs-at-law of Davis all their right and title to the estate, both real and personal, and the net proceeds to be equally divided between the four; that the purchase was made by Handlin for the four, and, as a part consummation of the agreement, they had conveyed to Hibbs or Lay one of the tracts of land. They also allege that Handlin failed to make a true exhibit of the estate, and placed before them the will of Swansey, and the history of the claim of the collateral kindred, with a view of inducing them to believe that the recovery was doubtful, so as the estate might be obtained for less than its value; that they had never seen the estate, and believing that the conflicting interests might prevail, they were induced to part with $20,000 for the sum of $2,000.

The court below canceled the entire contract, and of this the appellants are complaining, Hibbs and Lay insisting that they have no interest in the controversy other than as the personal representatives of the decedent.

There are several volumes of testimony in the record relating to the condition of the estate, and the interviews by Handlin with the appellees while in Missouri, and what transpired in Livingston county with reference to the alleged fraud in the procurement of the contract. We do not feel called upon to analyze all this testimony, or even to determine whether Handlin's representations to appellees in Missouri, as to the condition of the estate, were calculated to deceive the appellees, and made for that purpose, as we may assume that the acts of Handlin are all induced by

the best of faith, and still the judgment below annulling the contract was proper. The testimony of Handlin has been taken in the case, and from his statement, he seems to have taken all the pains that could be required of him in making known to the appellees the character of the estate, and the probability of their recovering it, and still, the exhibition by him of the obstacles in the way of recovery might well be considered as having been suggested with a view of effecting the purchase he was about to make. It only shows that, however cautious the attorney may be in trading with his client, his efforts to enlighten the client fully in reference to the claim will, in almost every instance where the attorney has made a good bargain, and speculated on his client's property, result in creating a suspicion, at least, that his motives were not pure, and for this, if for no other reason, the attorney should abstain from contracting with his client in reference to the subject-matter of the litigation. It appears from the admissions of all the appellants to this record, and the proof in the case, that soon after this estate was administered upon by Lay and Hibbs they made an agreement with Handlin and Bush, who were their confidential advisers in regard to the estate, to make this purchase, and to divide the profits between them. What was the agreement between the administrators and their attorneys, from their own statements? It was, in substance, that Handlin and Bush were to borrow or furnish the money to make the purchase, and when the purchase was made, Lay and Hibbs were each to have an interest of one fourth in the estate by paying one fourth of the cost of the purchase. All other costs, attorney's fees included, to be paid out of the assets of the estate in their hands as administrators when the estate is settled; but the said Lay and

Hibbs have the right, at any time before the estate is wound up, at their option, to accept or reject this contract.   With this agreement, Handlin and Bush borrowed the money, and the two administrators became their sureties, and in a short time after Handlin's return from Missouri, one of the administrators, Lay, takes the tract of land at a fixed price, to be paid for at a period when the estate would likely be finally settled.

The personal representatives were permitting, by an express agreement, their confidential advisers and attorneys to speculate by purchase from those whose interests they all represented, reserving the right to share the profits if they saw proper.   It was only a question whether or not profits would be realized to such an extent as to exceed the allowance to the personal representatives; if so, they were interested in the estate, and the administrator taking the land, to be paid for when the estate is wound up, is conclusive as to the extent of his interest in the speculation.

It is argued by counsel for the appellants that, by the terms of the agreement between the administrators and the attorneys, the former had no interest in the purchase, and he cites from Parsons on Partnership to the effect that " if a man make an agreement for a partnership, but expressly reserve for himself twelve months the option of determining finally whether or not he will be a partner, he is not one until he exercises that option and declares himself such."   He is not a partner under such an agreement is evident; but his right to become a partner can be enforced by reason of the contract; and so, by the terms of the agreement between the administrators and the attorneys, the right to participate in the profits can be asserted at any time until the final settlement of the estate; so there was a

right that could be enforced by reason of this contract by the administrators; and no defense but that the contract is against public policy could be interposed by the attorneys to prevent the administrators sharing the profits of this purchase with them.

If the purchase had been made by a stranger—that is, one not employed as counsel by the personal representative—under such an agreement with the personal representative, he would be regarded as holding the property in trust for those of whom he purchased; but here the contract to purchase is with the administrators and the attorneys for the estate they are administering, all occupying, in the eye of the law, a confidential relation to these appellees, although the latter may have been in ignorance of that fact when the contract was consummated.

Handlin and Bush, it is true, had not been employed by the heirs, and they did not know that the personal representatives had employed them; but this is an immaterial fact, when applying the rule of law that must govern this case. They were, in fact, the attorneys of the heirs by reason of the employment by the personal representatives; they were being paid out of their estate, and the nature of the employment required them, by their advice and counsel, to fully protect and advance the interests of the estate in every particular when not inconsistent with their professional obligations.

The personal estate was of the value of eight or nine thousand dollars, and the inventory amounted to near fourteen thousand, all of which passed into the hands of the attorneys and administrators as absolute owners, with the privilege, on the part of the administrators, of disclaiming any interests at any time, as they maintain, up to the final

settlement of the estate. The confidential relations existing between these parties forbid the making of any such contract as they admit was made. An administrator or executor is not allowed to purchase or speculate on the estate confided to him for the purposes of administration, nor can the attorney contract with his client in regard to the subject-matter of the litigation. Such contracts may not be void, and the chancellor, when it is for the benefit of the estate, might decline to cancel the trade, or, when full value has been paid, the parties, acting in the best of faith, might decline to interfere, because they could not be placed in *statu quo;* but in this case, assuming that the estate is only of the value of twelve thousand dollars, as appellants agree, the personal representatives and the attorneys obtain it for two thousand dollars. This gross inadequacy of price will make the chancellor indulge his suspicions of wrong, and when he finds that the personal representatives and their attorneys have made the bargain and are reaping the profits, he will not examine into the evidence of good faith or the knowledge the heir or client had of the litigation or the condition of the estate, but will proceed at once to annul the contract; and while the realty, as well as the personalty, may be embraced by its terms, he will not cancel in part but in whole. While it may be conceded, for the purposes of this case, that no improper influences were used by Handlin or false representations made in the procurement of the contract, there is the confidential relation existing between the parties and the great inadequacy of consideration; two facts the existence of which cannot be denied, and being established, must control the decision of this case.

There is a manifest difference between a contract entered into by parties dealing at arm's length, with the value of the

thing contracted for being merely speculative or depending upon a contingency, and a contract made between a guardian and his ward, the executor and distributee, or the attorney and client.   Where the claim is even doubtful that is the subject of sale, the chancellor will not allow the guardian, executor, or attorney to profit by his purchase, and will cancel the contract, or make him pay over the profits resulting from his speculation.

Perry on Trusts says: Trustees "cannot use the trust property nor their relations to it for their own personal advantage.   All the power and influence which the provisions of the trust fund gives must be used for the advantage and profit of the beneficial owners, and not for the personal gain or emolument of the trustee.   No other rule would be safe.   A trustee, executor, or assignee cannot buy up a debt or incumbrance to which the trust estate is liable for less than is due thereon, and make a profit to himself, but it inures to the benefit of the estate."   (Perry on Trusts, pages 533 and 534.)

"The same principles apply to transactions between all persons standing in confidential and influential relations to each other."   Upon the same principles administrators and executors cannot purchase the estate under their charge to administer.   "The relation of attorney and client is one of especial confidence and influence, and while that relation continues, the attorney cannot receive gifts or make purchases from his client."   (Perry on Trusts, pages 246 and 251.)

Applying these familiar principles to the facts of this case, without reference to the particular cases in which this doctrine has been recognized, and there is no escape from the conclusion reached by the chancellor below.   It is not

necessary to discuss the question of fraud, but determining this case alone upon the testimony for the appellants, and the law is for the appellees; nor was it necessary for the appellees to tender back the money received under such a contract. The parties are in the possession, and have a lien for what they have paid. They can be placed in *statu quo*, and the beneficiary of the trust allowed to obtain only what the trustee holds for him. It is plain that the court below regarded the administrators as interested with Handlin and Bush in the contract, and therefore the judgment against them for costs.

Judgment affirmed.