# Frank v. Thompson.

(Decided November 25, 1924.)

## Appeal from McCracken Circuit Court.

1. Partnership—"Partnership" Relation Founded on Voluntary Contract, and Contemplates Sharing of Profits and Losses.—The "partnership" relation is founded on a voluntary contract, wherein the minds of the parties meet on the terms, and contemplates the sharing of profits and the express or implied agreement to bear losses.

2. Partnership—Facts Held to Establish Merely an Unconsummated Agreement to Form Partnership, and Not a Partnership Agreement.—Where plaintiff and defendant agreed to buy a race horse as partners, and made effort to purchase horse, but on owner's sale to third party abandoned further efforts, there was no partnership on defendant's subsequent purchase of horse from third party, the executory contract for formation of partnership not having been consummated.

3. Appeal and Error—Chancellor's Finding of Fact Not Disturbed, Unless Against Weight of Evidence.—Chancellor's Finding of fact will not be disturbed unless against weight of evidence.

WHEELER & HUGHES for appellant.

· MOCQUOT, BERRY & REED for appellee.

|OPINION OF THE COURT BY CHIEF JUSTICE SAMPSON—Affirming.

Appellant Frank seeks by this action to have an arrangement made between him and appellee, Thompson, declared an executed partnership agreement, and to have a settlement of the partnership affairs and a distribution of the proceeds after the obligations have been satisfied. The answer of appellee Thompson denies the formation or existence of the alleged partnership, and all liability thereunder, and denies appellant Frank is entitled to any settlement or distribution.

The cause being submitted upon the pleadings, proof and exhibits, the chancellor dismissed Frank's petition and he appeals.

Both Frank and Thomas were interested, more or less, in race horses and racing. On the closing day of the fair at Paducah, in September, 1920, a new and untried horse was entered in a pacing race and made an unusually good showing. The animal belonged to a colored in that vicinity. Many experienced horsemen who

witnessed the race believed the animal had a great future and some of them wanted to buy the horse, but they did not know the owner or where to find him. At the hotel that night some horsemen from Tennessee authorized Frank to purchase the horse on their account and he agreed to do so providing he could not arrange to buy it for himself. This conversation was overheard by appellee Thompson, who immediately called appellant aside and suggested that they (appellant and appellee) acquire the horse jointly and own and race him at fairs and otherwise as a partnership business. Appellee further suggested he had a horse which he would like to trade for the one in question, and it was further stated in the conversation that Frank also had a horse that might be used in trade to acquire the desired animal. Thompson also suggested that Frank decline to make any effort to buy the horse for the Tennessee people or to represent them in an attempt to purchase, so that the horse might be acquired for the proposed partnership. This was agreed upon, as appears from the evidence of both men. It was also agreed that the two should, on the following Sunday, seek out the owner of the horse and try to trade for the animal. This all happened on Friday night. Accordingly on the following Sunday appellant and appellee got together and went to see a man named Vaughn, who resided near the colored man and who knew the horse and its owner. They told Vaughn their plans and asked him to assist them in trading for the horse and promised to pay him for his services, the horse to be bought for the joint account of Thompson and Frank. Vaughn agreed to go see the owner of the horse and to bring him, if possible, to Paducah on Monday. Thompson had a racing engagement in a neighboring town and had to go away, but before going he and Frank agreed upon a mode of procedure, the substance of which was that Frank was to remain at Paducah and see Vaughn and the owner of the horse when they came in on Monday and if possible to trade one or the other of their horses for the horse of the colored man, and was to let Thompson know how things progressed. On Monday Vaughn came to Paducah and informed Frank that he tried to induce the colored man to trade for one of the horses owned by Thompson and Frank and that he refused to trade but did trade the coveted horse for one owned by Vaughn and Vaughn announced himself the owner of the racer. He priced it to Frank for the partnership at

the price of $250.00. As Frank had no authority from Thompson to buy the horse outright, and especially at the price of $250.00, he could not close the trade, and asked him for time in which to exercise an option to purchase, and it was agreed that Frank was to have until the following Wednesday morning at nine o'clock in which to exercise the option. Frank took a train and met Thompson at a midway station, where he told Thompson the outcome of the matter and of the option. Declaring they had been double-crossed by Vaughn, Thompson called the deal off, as he says, and decided to have nothing more to do with it. Frank continued his journey and did not see Thompson any more for some days. On Wednesday Thompson came to Paducah and on Friday met Vaughn upon the streets and accused him of bad faith in the dealing. They separated. Later in the day, according to the evidence of Thompson and Vaughn, they met again and Thompson purchased of Vaughn the horse at the price of $250.00 and gave him a check. Frank was not present and did not know of the deal until some time later. Soon thereafter Thompson started racing the horse in Illinois, where he proved a big success. At the close of the season he returned home and wanted to buy a full sister of the horse then owned by the same colored man and suggested to Frank that he buy the animal. Before Frank had opportunity to make the trade he saw the stableman of Thompson on the street leading both the racer and the filly which Thompson had directed Frank to buy. Thereupon Frank immediately went to Thompson's office and remarked to Thompson, as the latter claims, in substance, "You have beat me to it, and bought the filly," whereupon Thompson remarked to Frank in substance "Old man, I have not forgot our trade about the horse; he has been winning some money; let's have a division." Frank declined a division, so he testified, saying that he would let the money be applied upon the expenses and take his share the next spring after the winter was over. Thompson denies that he offered to divide the proceeds of the racing, but admits that he said to Frank that the horse had been winning some money and he was willing to give Frank a sufficient sum to make him whole on account of the loss of the sale of the racer to the Tennessee parties. There was little else said or done between the parties with respect to the alleged partnership arrangement.

The chancellor concluded that appellant Frank had not established the existence of a partnership and was not entitled to participate in the profits arising therefrom, and dismissed his petition.

It is hornbook law that a partnership relation is founded upon a voluntary contract wherein the minds of the parties meet upon the terms, and contemplates the sharing of profits and the expressed or implied agreement to bear losses. 30 Cyc. 358; 9 L. R. A. 455; Hartford Insurance Co. v. McClain, 1 A. K. M. 182.

There is a great difference between an executory contract, looking to the formation of a partnership, and a partnership agreement, recognized by the courts. This principle is well expressed in 30 Cyc 358:

"Persons who have entered into a contract to become partners at some future time, or upon the happening of some future contingency, do not become partners until the agreed time has arrived or the contingency has happened. Whether a partnership exists is determined by ascertaining from the terms of agreement whether any time has to elapse or any act remains to be done before the right to share profits accrues; for the parties will not be partners until such time has elapsed, or the act has been performed. The mere agreement to form a partnership does not of itself create a partnership; nor does the advancement by one party of his agreed share of the capital. The entire agreement and all of the attending circumstances are to be taken into consideration in determining whether a partnership has been actually launched."

A very apt discussion of the difference between an agreement to form a partnership and a partnership agreement is found in Reed v. Meagher, 9 L. R. A. 455:

"Upon the foregoing statement the first question naturally suggested is whether a copartnership was ever actually entered into between Meagher, Reed, Smith and Van Avery, as declared by the court below by the first finding. A marked distinction exists in law between an agreement to enter into the copartnership relation at a future day and a copartnership actually consummated. It is an elementary principle that a partnership in fact cannot be predicated upon an agreement to enter into a co-

partnership at a future day unless it be shown that such agreement was actually consummated. In the language of the text books, the partnership must be 'launched.' To constitute the relation, therefore, the agreement between the parties must be an executed agreement. So long as it remains executory the partnership is inchoate, not having been called into being by the concerted action necessary under the partnership agreement."

Appellant Frank's contention is, that Thompson took advantage of him by inducing him to withdraw from the employment of the Tennessee parties to purchase the horse for them and to help Thompson to obtain the horse for their joint venture and after appellant had performed all his part of the undertaking and had obtained an option to purchase the animal from Vaughn at the price of $250.00, at any time before nine o'clock on Wednesday morning following, and reported this fact to Thompson, the latter deceitfully and for the purpose of defeating appellant's rights under the partnership arrangement allowed the option to expire and then undertook to and did buy the horse for his own account. True the option was allowed to expire and Thompson thereafter bought the horse at the same price at which Frank had the option to purchase for the partnership. These facts tended to establish appellant's claim that a partnership arrangement had been consummated. We must not, however, overlook the fact that Thompson declared the whole matter off when Frank informed him that Vaughn had bought the horse on his own account and was asking $250.00 for it. After the interview with Thompson appellant Frank went his way and made no other attempt to buy the animal nor to aid Thompson in doing so. Neither did Frank assert his rights under the alleged partnership until Thompson had purchased the horse and demonstrated his superior qualities. The horse is now of great value, but at the time Thompson and Frank entered into the arrangement to purchase it the animal was untrained and of comparatively little value.

We conclude that the partnership arrangement proposed by Thompson to Frank was never consummated, for its consummation depended upon the acquisition of the horse in question. After making some effort to buy the horse the parties mutually agreed, it seems to us, to abandon the venture and both, no doubt, intended to

do so when they parted, following their interview between trains. Certain it is that appellant Frank abandoned the whole scheme, for he made no further effort to carry it out, and this, too, although he was fully advised that the option to purchase the horse would expire at nine o'clock on Wednesday morning. The arrangement proved to be a mere gesture towards the formation of the partnership. It was never executed.

Undoubtedly this is the view the chancellor took of the evidence and the law. At any rate he dismissed appellant's petition. The finding of fact of the chancellor is entitled to some weight. His judgment will not be disturbed unless it be against the weight of the evidence. This confirms us in our conclusion above stated and we have decided to adhere to the ruling of the chancellor and affirm his decree.

Judgment affirmed.