## Burchett v. Louisa Light & Power Company et al.

(Decided May 13, 1930.)

(As Modified on Denial of Rehearing October 21, 1930.)

W. D. O'NEAL for appellant.

WAUGH & HOWERTON and C. F. SEE, JR., and FRED M. VINSON both for appellees.

OPINION OF THE COURT BY COMMISSIONER STANLEY—Affirming on cross-appeal and reversing on original appeal.

The appellant, D. J. Burchett, Jr., sued the appellees, G. R. Vinson, Mrs. Emma Vinson, T. W. Hodge, Mrs. Helen Hodge, and the Louisa Light & Power Company, a corporation, claiming an interest in a partnership formed in the spring of 1924 by Vinson, Hodge, and himself to build and operate a light and ice plant in Louisa; and also asserting his ownership of $2,500 in stock of the corporation which took over the property of the partnership. He asked for a settlement and account-

ing. He further pleaded that should it be adjudged that he had no such interest he recover $1,400 for seven months' service rendered the partnership and $1,000 for five months' work for the corporation. It was adjudged that the plaintiff did not have any interest in either company, but was entitled to recover $1,100 for work and services performed for the companies. The case is before us on an original and cross-appeal from that judgment.

Burchett, Hodge, and three other gentlemen, who are not now involved, began negotiations looking to the formation of a company to take over an old plant, but agreed on the construction of a new one, and acquired a franchise from the city in the name of Hodge. According to Burchett's contentions it was ultimately agreed between Hodge, Vinson, and himself to form a company for that purpose; Vinson to finance the enterprise, and he and Hodge to contribute their services, each having a one-third interest. According to the appellee's contention, it was first agreed that Burchett, Hodge, and the three other gentlemen were each to put in $5,000. Hodge alone put up $5,000, and work on the project was begun. Shortly thereafter the other three withdrew, and Mr. Vinson, a banker, came into the scheme, as he says, to protect himself as surety on the franchise bond and to help his son-in-law, Hodge. They insisted on Burchett putting up his $5,000, but he never did so. Burchett and Hodge both looked after the work of constructing the plant and operating it for about seven months, when Burchett quit some time about the 1st of November, 1924, because as he says, he was not drawing anything from the company and had to return to the coal business in order to support his family. Appellant says that he could not raise any money because his brother-in-law, Vinson, would not help him; while appellees introduce evidence to show that he could have done so. However, that is not material as we see it, for it is conceded he had put no money in the enterprise up to that time. He made a statement to a friend that he was out of the business and was glad to be out. No written memorandum seems to have been made of any of these negotiations or arrangements, it being a family adventure and rather loosely organized.

In the latter part of November, 1924, the company was incorporated with a capital of $50,000, divided into shares of the par value of $100. The articles of incorpo-

ration show that the subscribers and holders of the stock were G. R. Vinson, 150 shares; his wife, Mrs. Emma Vinson, 20 shares; T. W. Hodge, 30 shares; and his wife, Mrs. Helen Hodge (the daughter of Vinson), 50 shares. The record shows that Vinson paid for and to the company about $15,000; Mr. and Mrs. Hodge each about $5,000.

When Burchett quit in November, his family remained in Louisa, but it appears that his business kept him away from home most of the time. He returned in April, 1925, and testifies that Vinson and Hodge both insisted that he should raise the money and take over his interest in the company. This they deny, and say he was wanting a job, and they agreed to give him the day engineer's place at $21 a week. This proved too heavy for Burchett, and he soon quit that work and looked after the office, read the meters, and perhaps performed other services until August or September, 1925. It is, however, admitted that Mrs. Vinson and Mrs. Hodge urged their husbands to let Burchett in the company, and the two men rather reluctantly agreed that he might acquire the $5,000 worth of stock as originally contemplated. Burchett went to a sister, Mrs. Ratcliff, who resides at Huntington, W. Va., to secure funds. Mrs. Ratcliff says she would have let him have $5,000, but he only wanted $2,500. Not having the money, she executed a note to the First National Bank, of which Mr. Vinson had for many years been cashier, for $2,500, with certain personal securities of her own pledged as collateral. She says this was for the specific purpose of letting her brother have the money with which to buy the stock "absolutely without any personal interest whatever so far as I was concerned; it was to be at his disposal absolutely." Mrs. Ratcliff makes it clear that she was helping her brother in every way and told Mr. Vinson that if he (who was also Mrs. Vinson's brother) could not pay the interest on the note to advise her and she would pay it, but Mr. Vinson told her he would take care of that.

The proceeds of the note did go into the treasury of that corporation. It is said by the defendants that Mrs. Ratcliff emphatically insisted with Mrs. Vinson and Mrs. Hodge that no stock should be issued to Burchett until he had paid off this note. Of this they informed their husbands, who were president and general manager, respectively, of the company and in absolute and active charge of it. She says she merely stated that she wanted

her collateral released before the stock was issued to him. Burchett did not pay this note and it was renewed several times by Mrs. Ratcliff. At the end of the first six months, Burchett drew the company's check for $50 to pay the interest and charged it to himself on the books of the company. When that was discovered it greatly displeased Vinson, and he personally reimbursed the company that sum and took the books away from Burchett. It does not appear that payment of the note was demanded of Burchett during any of this time. Finally, on April 10, 1927, Hodge paid the note without the knowledge of either Burchett or Mrs. Ratcliff. When her collateral was offered to be returned to her, Mrs. Ratcliff assumed that her brother had satisfied the note. She testified that she authorized no one to pay her note, and, "I certainly did not want it (the stock) taken away from him." When Hodge paid off the note, he took over that stock for which no certificate had been issued. It does not appear that any certificate was issued to Hodge. Indeed, it seems that no certificates were actually issued to any of the four stockholders. Being held by one family and its business transacted wholly by them, the usual formalities and procedure seem not to have been followed.

The entire business was sold in February, 1928, to another company for $115,000, less certain charges. It is stated by Mr. Vinson that the plant had cost between $50,000 and $60,000, but the figures given in the record would indicate the cost to have been about $35,000, plus the value of the lot which belonged to Mr. Vinson. The difference between the paid-in capital of $27,500 may be represented by the profits, which seem to have been put back into the business.

The court concludes that the appellant acquired no interest in the copartnership. The evidence and admitted circumstances indicate clearly that he was to put up $5,000 of the capital but did not do so. It was contemplated by all the parties that he should become a partner but he did not. As between themselves the status of a partnership never existed. The relation was merely that of a contemplated partnership, for the agreement, so far as appellant is concerned, was never consummated because of Burchett's failure to comply with it. Handlin v. Davis, 81 Ky. 34; Hobbs v. Ray, 96 S. W. 589, 29 Ky. Law Rep. 999; Frank v. Thompson, 207 Ky. 335, 269 S. W. 295; 20 R. C. L. 811.

Not having become a partner, Burchett is entitled to reasonable compensation for his services which were accepted by his associates. They undertake to minimize those services, but we are of the opinion that the sum adjudged by the trial court, to-wit, $600, is at least a fair valuation.

As to the purchase of the stock, we think it clear that appellant acquired 25 shares. The money, as stated, went into the company's treasury, and all of its officers were fully aware of its source and purpose. We have no doubt that the sister merely intended that the stock to be issued her brother was to be considered as additional collateral for the note and was not to be released until the note was paid. But even though it was as contended by the appellees, that the sister afterward advised the parties that no stock should be issued him until he paid the note, that can have no bearing whatever on the question. She did not attach any condition to the issuance of the stock. When the company received payment for it, it was obliged to issue the stock to Burchett and might have been compelled to do so at any time. Mrs. Ratcliff's transaction was with the bank, which was, of course, a separate entity.

The contention that the claim of appellant cannot be recognized because no certificate of stock was issued to him cannot be sustained. Such certificate is but the symbol or paper evidence of ownership. Without it being issued, Burchett in fact owned 25 shares of stock in the corporation. Judy v. Steer's Adm'x, 199 Ky. 221, 250 S. W. 859; Charles v. Hopkins, 217 Ky. 842, 290 S. W. 720. Nor is there merit in the argument that Burchett is not a stockholder because he did not attend any meeting of the stockholders or otherwise evidence an interest as such. Both of these contentions were similarly disposed of in Owingsville & Mt. Sterling Turnpike Road Co. v. Bondurant's Adm'r, 107 Ky. 505, 54 S. W. 718, 21 Ky. Law Rep. 1219, in which it was held that stockholders have the right to rely upon those in charge of the corporation to maintain their rights. In Com. ex rel. Mercer County Court v. Springfield, Maxville & Harrodsburg Turnpike Co., 73 Ky. (10 Bush) 254, the company was ordered to issue certificates of stock to the county and recognize it as a stockholder, since it was shown that 23 years before the county had subscribed and paid into the treasury of the company $1,000 for 50 shares of its

stock, although it appeared that the county was without authority to make the subscription. The right of the company to appropriate the money to its own uses and purposes without liability to any one was denied. So, too, must the right be denied this company to accept money in payment of stock subscribed by Burchett and issue certificates to a third person simply because he had voluntarily liquidated Burchett's indebtedness to another. The bank had no concern whatever in this transaction, except to look to Mrs. Ratcliff for the payment of her note. The company was not concerned with the source of Burchett's money or his obligation.

Although it is shown in evidence that the other stockholders had not been paid for their services, it is apparent from the record that Burchett never agreed to work for the corporation for nothing. Indeed, the appellees themselves prove that he was given employment first as engineer at $21 a week and later was permitted to assume and perform other duties. The sum fixed by the court, $500, is not at all unreasonable for those services.

On the cross-appeal the judgment is affirmed. On the original appeal it is reversed, with directions to adjudge the plaintiff entitled to 25 shares of the capital stock of the corporation, certificate for which was issued to Hodge. Of course, there should be an adjustment of the equities between the parties, which, in the first instance, should be made by the circuit court.