OCTOBER TERM, 1904. 67

*2 Robbins.* O'Connor *v.* International. Silver Co.

## MICHAEL P. O'CONNOR

*v.*

## INTERNATIONAL SILVER COMPANY and the UNITED STATES SILVER CORPORATION.

[Decided December 1st, 1904.]

1. Under *P. L. of 1896 p. 290 ch. 185 § 38*, declaring that the stock of a corporation belonging to the corporation shall not be voted on, the officers and directors of a corporation which has acquired some of its own stock by the purchase of all the capital stock of another corporation owning it, are precluded from voting on the shares so acquired at a meeting of the stockholders for the purpose of electing directors.

2. Where the officers and directors of a corporation which has acquired some of its own stock, by the purchase of all the capital stock of another corporation owning it, attempt to vote on the shares so acquired at a meeting for the purpose of electing directors, a person who owns stock in the corporation, but which stands in the name of his grantor on the books of the corporation, is entitled to sue to prevent the illegal voting of the shares in question.

3. Where the bill in a suit to prevent the officers and directors of a corporation from voting shares of the corporation's stock at a meeting of the stockholders for the purpose of electing directors charges that persons own and control enough of the stock of the corporation, which, if used in connection with the shares of its own stock acquired by the corporation's purchase of all the capital stock of another corporation, would make a majority of the voting strength of its stock, and intend so to do, it is sufficient as against an objection of vagueness, though failing to specify the amount of stock and the names of the persons who own and control it.

4. Where the bill charged that the officers were drawing excessive salaries, the failure to state their names and their specific official designations would not affect the sufficiency of the bill as against an objection of vagueness, no relief being sought on such allegations.

On demurrer to bill.

*Mr. John W. Griggs,* for the demurrant.

*Mr. Charles D. Thompson,* in support of the bill.

PITNEY, V. C.

The two important questions raised by the demurrer are the following:

*First.* Where corporation A has acquired all the capital stock of corporation B, and at the time of such acquisition corporation B owned and held a large number of the shares of the capital stock of corporation A, can the officers and directors of corporation A, at a meeting of the stockholders of that corporation held for the purpose of electing directors, be permitted to vote upon the shares of the stock in corporation A held by corporation B at the time of the acquisition of all its stock by corporation A?

I think there can be but one answer to this question when we come to consider the actual and substantial situation, stripped of its mere shell of formality.

Our trading corporations and all their assets belong to the actual stockholders and not to the directors. The stockholders or shareholders are the actual and beneficial owners. The artificial entity—the corporation—is a mere shell legalized and adopted for the purpose of securing perpetual succession and convenience in the division and transfer of ownership. The corporation affairs, indeed, are managed wholly by the directors, who are chosen by and represent the owners, and derive their power wholly from them. In actual practice these owners are powerless to control and manage their property except through their directors.

In fact, the scheme of corporate management is that of a representative government, in which the representatives are bound to be governed by and represent only the interests of those they represent. Hence any device or practice which in anywise or to any degree diminishes or prevents the exercise of the right of each of the actual owners to have a voice in the election of directors precisely in proportion to the amount of his interest is vicious and in positive contravention of the fundamental principle upon which our corporations are built up.

Applying these principles to the case put, we find that the actual ownership of all the assets of corporation B passed by the sale of all its stock to the actual shareholders in corporation

A. It follows, therefore, that the real owners of the shares of stock of corporation A which previously belonged to corporation B is vested in the stockholders of corporation A, and they alone, in justice and equity, have the right to vote upon them in the election of directors. To permit the officers or directors of corporation A to vote upon them is to permit them to vote upon shares which they do not own. And it matters not that they cast such vote in their official capacity as officers or directors.

The actual substance of the affair is not changed by the fact that the nominal ownership of the shares in question remains in corporation B. That corporation can no longer have either individual stockholders or directors, because there are not in existence any persons capable of acting as either.

A corporation is incapable of being a director, and, under our system, the existence of directors is an essential part of the artificial creature known as a trading corporation.

However, granting that corporation B is still in existence (which is not a part of the case stated), and that sufficient of its shares are held nominally by individuals to keep up its organization, still they are mere trustees, and are bound to vote upon its shares according to the direction of their *cestuis que trustent,* who are the shareholders of corporation A, and not its officers or directors.

I am unable to perceive the least difference, in the view of a chancellor who disregards the shell and looks at the substance of things, between the case in hand and that where the shares of stock in a corporation are bought directly by it and assigned to it. As to such shares, the common law, as well as our statute, forbids their being voted upon by the officers or directors.

In *Ex parte Holmes, 5 Cow. 426,* the right of certain persons who held certain shares of the stock of a corporation in trust for it to vote upon those shares at the election of directors was brought in question upon a summary proceeding in the New York supreme court to test the validity of an election for directors, and was thoroughly argued by distinguished counsel and repudiated by the court. The court says (at *p. 434*) :

"But the question remains whether the latter are to be deemed

stockholders, within the spirit of the act. True, the stock on which they voted, in this case, stands in their name; but on the face of the entry they are declared to be mere nominal holders. The real owner of the stock should vote, especially where his name is truly expressed in the books, though it might be otherwise if he chose to have the entry simply in the name of another, without expressing any trust.

"Now these three persons, a majority of whom claim a right to vote, are mere trustees, and they are trustees not for the directors, but for the company—the corporation itself. *If there could be a vote at all upon such stock, one would suppose that it must be by each stockholder of the company, in proportion to his interest in it.*

"This brings us to the important difficulty in the case, which is whether stock thus held can vote at all. And we think it is not to be considered as stock held by anyone for the purpose of being voted upon."

This doctrine was followed in *Ex parte Desdoily, 1 Wend. 98,* and by the supreme court of Massachusetts, in *American Railway Frog Co.* v. *Haven, 101 Mass. 398.*

Mr. Cook, *1 Cook Stock. (3d ed.) p. 421 § 314,* says:

"When a corporation buys shares of its own capital stock the capital stock is not reduced by that amount, nor is the stock merged. So long, however, as the corporation retains the ownership the stock is lifeless, without life or powers. It cannot be voted nor can it draw dividends, even though it is held in the name of a trustee for the benefit of the corporation."

And, again (at *p. 830 § 613*):

"Shares of stock owned by the corporation itself cannot be voted, either directly by the corporate officers or indirectly by a trustee of the corporation. This is the established rule, whether the stock is registered in the name of the corporation or not.

"Where the directors, just before the election, issue or sell stock owned by the corporation, the purpose of such issue or sale being to control the election, the courts will interfere at the instance of other stockholders where an actual fraud is involved."

To the same effect is *1 Thomp. Corp. Off.* § *734,* where he says that the rule is based upon public policy; and, again (§ *3277*), he says that the practice of directors voting upon the stock of the company held by itself is not to be tolerated.

Our legislature, as early as December 8th, 1825, in the third section of the act to prevent fraudulent elections by corporations (*2 Harr. Comp. 113*), provides:

"that if any incorporated company in this state shall purchase any of the stock of such company or take the same in payment or satisfaction of any debt due to them, such company shall not vote in virtue of their stock so purchased or taken, either directly or indirectly, at any election for directors of said company."

That section remained unchanged upon our statute book until the recent revision of our corporation statutes, when it was displaced by section 38, which declares that "shares of stock of a corporation belonging to said corporation shall not be voted on, directly or indirectly."

That the shares of corporation A owned by it through its ownership of all the shares in corporation B are within the equity of this statute as well as within the mischief which it was intended to prevent, is too plain for argument.

Our own supreme court, in *M'Neely* v. *Woodruff,* '*13 N. J. Law* (*1 J. S. Green*) *352* (*1833*), dealt with this question. Judge Ford (at *p. 360*) says: "The next definite charge, that the inspectors admitted illegal votes, contains a specification of fifty votes being allowed to Mr. Woodruff, in virtue of shares *belonging to the company* and transferred to him, as president, *in trust, to sell them* for the benefit of the corporation. That these shares were equitably and substantially not his own, but the property of the company, is a fact that can admit of no controversy, and the question arising out of it is, how and in what form the company could have voted on them in case they had not been transferred in trust. *Belonging to the company, they belonged to each and every stockholder in proportion to his interest in the capital of the bank, an interest that could be represented only in fractions.* As there are no fractions of a vote, *the real owners* could not possibly exercise the privilege; nor could it devolve on the

*directors,* because they are not the *owners* of it; they are no more than *trustees,* like the president himself. The shares are so circumstanced that the real owners cannot vote, and the *necessary consequence is* that they can be *voted upon by nobody.* This principle is virtually established by the third section of the act of 1825—that if a company purchase or take stock in payment it shall not vote in virtue thereof at any election of directors. It is necessarily so at the common law, without the aid or corroboration of this statute.

"In *Ex parte Holmes, 5 Cow. 435,* the point was fully considered and determined that stock belonging to the whole company cannot be voted upon in choosing directors for that company by anybody. This determination is the only one that can rationally be adopted, and it shows that these fifty votes were illegally received."

This doctrine was subsequently recognized by the supreme court *In the matter of the election of the St. Lawrence Steamboat Co., 44 N. J. Law (15 Vr.) 529* (at *p. 539*).

The law, as found in our statute and illustrated by these judicial decisions, is so well settled that I should not have thought it worth while to spend any time upon it but for the very earnest and apparently sincere insistment to the contrary of the counsel for the defendant.

*Second.* The next question raised by the demurrer is this: Can the owner of shares of stock in corporation A, which he has held for several years, and who is entitled, without question, at any moment, except when the books of transfer are closed preparatory to an election or a dividend, to have a certificate issued to him, but has never exercised that right, and whose shares stand on the books of the company in the name of his grantor, who, however, has no interest therein, have a standing in this court to ask the court to prevent corporation A, by its officers, from voting upon the shares in question?

It may be admitted that the stockholder has not the right to vote in person on his shares. He may be content to permit his assignor to vote thereon because that assignor is willing to vote as he, the actual owner, directs, or, what is perhaps the

more common practice, to give him a proxy to vote in his name, but such disability, if it be a disability, is the only one under which the actual owner labors. Should any dividend be declared his assignor will receive it for the actual owner's benefit, and I think there can be no doubt that the latter has the right in equity to intercept its payment by the corporation to his assignor. Except in these matters his title is absolute and complete.

I am able to perceive little, if any, resemblance in the relations between the registered owner and the real owner of shares of stock and those which exist between the ordinary trustee of an express trust and his *cestui que trust.* In the latter case the trustee is the actual legal owner and the *cestui que trust* the owner only in equity. In the case of a transfer of a certificate of shares of stock by an assignment in the usual form for value received and a delivery of the certificate, which is the usual mode of making title to shares of stock, the complete legal and beneficial title passes, and the transfer on the books of the company is not necessary in order to make the legal title complete. The situation resulting from such an assignment, without transfer on the books of the company more nearly resembles that of the owner by actual common law conveyance in fee of real estate which he has not taken the trouble to have recorded.

The *status* of the holder by legal assignment of a certificate of stock which has not been transferred on the books of the company is in some respects better than that of a real estate owner whose deed is unrecorded, because, in the absence of actual notice, the grantor of such a deed may make a good title to a purchaser in good faith for value.

This subject was exhaustively dealt with by Chancellor Green, in *Bank* v. *McElrath, 13 N. J. Eq. (2 Beas.) 24.* He there gave the holder by assignment of certificates of stock who held them as collateral security for a debt, with the usual transfer in blank from the owner, to whom they were issued and in whose name they stood on the books of the bank, preference over an attaching creditor of the registered owner. He points out the true office of the rule that the transfer must appear on the books

of the bank to be to protect the corporation from conflicting claims and to prevent disputes as to the right to vote and the like.

I am unable to perceive why a clear title to the shares of stock, with the immediate right to have the stock transferred on the books of the company, does not give the owner a right to the ear of this court to protect his interest in the corporation and its management.

Of course, the holder of shares of stock, whether standing in his name or not, may in a proper case be subject to estoppel by reason of something done or omitted to be done by himself or his predecessor in title, and it may well be that the case he presents to the court in asking its aid should show affirmatively that his shares are not burdened by any such estoppel. But such estoppel arises, if at all, quite independent of the *status* of the owner upon the books of the corporation.

Such a case was *Trimble* v. *Sugar Company, 61 N. J. Eq. (16 Dick.) 340,* where Trimble was the registered holder of the shares on which he based his rights.

Such was clearly the ground of decision in *Hodge* v. *Steel Corporation, 64 N. J. Eq. (19 Dick.) 90,* and, on appeal, *64 N. J. Eq. (19 Dick.) 807.* In that case there were three complainants—Hodge, Smith and Curtis. The case was heard on an application for an injunction and upon affidavits on both sides. The object was to enjoin a certain proposed action of the defendant corporation which required the sanction of a majority of the stockholders. It appeared affirmatively that Hodge was the registered owner of certain shares of stock which had not given any consent to or sanction of the proposed action. Hence his standing was upheld both in this court and on appeal. Smith held stock whose predecessor in title had expressly assented to the proposed action.

This was held a complete answer as to him. As to Curtis, the learned vice-chancellor says: "Complainant Curtis, at the time of the bill, was not, nor has he ever been, the owner of record of any shares, *nor is there any affidavit of ownership of shares made by him. In the absence of such affidavit showing*

*his ownership and the certificate or certificates of shares which he holds,* it cannot be known whether or not the previous holders of his shares, or any of them, have assented to the plan.

"If such previous holders of either the Smith or Curtis shares have assented, then neither Smith nor Curtis is entitled to a preliminary injunction against the execution of the plan assented to, so far as their rights rest on the ownership of these shares.

"My opinion is that a suit of the present character must be based upon an ownership of record at the time of filing the bill, and that the ownership of shares standing in the name of another will not be sufficient to maintain the suit. The suit, it will be observed, is not one which is brought against a third person to assert the general right of a holder of stock considered as property where ownership of shares transferred in blank and not actually transferred on the books might be sufficient evidence of ownership of the stock, but it is a suit brought by a complainant solely in the character of a stockholder, against the company itself and its directors, to restrain the violation of his rights as a stockholder, and to restrain proceedings alleged to be *ultra vires* and fraudulent against the company. This can be done only by a stockholder who holds a complete title as stockholder under the by-laws of the company, or who, being the owner of the stock, has done everything within his power to complete the title."

I respectfully suggest that the last sentence was unnecessary for the determination of the question before him unless it is to be read, as I believe it is, as referring to what he had previously said. That declaration of the law is relied upon here by the demurrants. When the *Hodge Case* was determined on appeal, *64 N. J. Eq.* (*19 Dick.*) *807*, the court said, "Curtis, so far as he appears, owns no stock," and that is all the court said. When we consider that there was no affidavit of Curtis that he owned any stock and no admission of such ownership by demurrer, we can see that this language of the court signifies nothing for present purposes.

Before looking farther into the authorities, let us ascertain just where complainant stands as to his ownership of stock. His allegation admitted by the demurrer is as follows:

"Your orator further shows that he is the owner of four hundred (400) shares of the common stock of the International Silver Company; that he acquired three hundred (300) shares of said stock on May nineteenth, nineteen hundred and two, and the other one hundred (100) shares on July thirtieth, nineteen hundred and two; that while said stock stands on the books of the company in the name of Alfred S. Hart, it is only nominal in him, and belongs to, and is owned by, your said orator."

As to the merits of the bill, it alleges that the International (the holding company) was organized in 1898, and absorbed sixteen other corporations engaged in the manufacture of silver and plated ware; that in the fall of 1902—after the purchase of his stock—the United States Silver Corporation, the other defendant, was formed, and soon became the owner of a large number (enumerating them) of the shares of the International company, sufficient, with that owned by certain persons interested in the management of the International, to control its management; that subsequently the management of the International secured for that company all the shares of the United States corporation, and thereby all its property, including the shares it held in the International; that for the purpose of acquiring all the stock of the United States, including the shares held by the latter in the former, the International issued and put upon the market two million of its bonds and a million and a half of its preferred stock, and that at the next meeting of the stockholders of the International for the election of directors, the management of the International proposes to vote on its own shares so acquired and held.

This statement shows that this case is in its facts quite different from the case of *Trimble* v. *Sugar Company* and *Hodge* v. *Steel Company*.

In *Trimble* v. *Sugar Company,* the prayer of the bill was to enjoin a particular business enterprise in which the sugar company had been engaged for a considerable period of time, with the knowledge of its stockholders. So with the *Hodge Case.* That is also quite different from the present case.

I can find no room in the case made by this bill, which, of course, is admitted by the demurrer, to suppose that the complainant or Mr. Hart, his predecessor in title, has ever done

anything, or failed to do anything, whereby the management of the International company has been induced to believe he would not object to the voting on the shares of that company. It is impossible to presume, in the present case, as I did in the *Trimble* v. *Sugar Company Case,* that any sanction has been given to the proposed action which would give the least ground for an estoppel.

Let us now look at the authorities. *Bagshaw* v. *Railway Company, 7 Hare 114,* before Vice-Chancellor Wigram, was a suit by scrip certificate holders of the defendant company to prevent a diversion of the funds of the company to the furtherance of an enterprise claimed to be *ultra vires.* The scrip was issued to the subscribers to the stock, which was payable in installments, and, as I infer, was issued before all the installments had been fully paid and was entitled, after all payments were made, to an issue of regular certificates of stock. These scrip certificates were registered, were assignable and capable of transfer on the books. A scrip certificate holder, therefore, stood in precisely the same situation as the holder of a certificate of stock. Some of complainants were holders of certificates by assignment which had not been registered.

The headnote in point here is as follows: "The proprietor of a scrip certificate, whether registered or not (such proprietor not being in default) may sue on behalf of himself and all other proprietors of like certificates, and of the stock which they represent, or into which they are convertible, where the proprietors of certificates and stock are very numerous; there being no incompatibility in the interest of the registered and unregistered proprietors to preclude the plaintiff from representing both classes of persons." At *p. 130,* Vice-Chancellor Wigram expressed himself as follows:

"It was not, I think, argued by the defendants that the proprietors and holders of scrip certificates in the perpetual stock had not such an interest in the application of the capital of the company as was necessary to enable them to maintain a bill, properly framed, to prevent a misapplication of the capital of the company. It clearly could not be so argued, for there was an

inchoate right in such parties to become general shareholders in the company. Nor was it argued that proprietors of registered certificates had not a similar interest; but it was said that the interest of the proprietors and holders of scrip certificates, and the interest of the proprietors of registered certificates conflicted with each other, and that as the plaintiff must sue on behalf of both classes the bill could not be sustained. I cannot take that view of the case. The holder of the scrip has an inchoate right to become a registered holder of the perpetual stock, and it is the interest of both classes in that stock which entitles him to sue, and if the scripholder has performed his conditions up to the time of filing the bill there is no such conflict as the argument suggests."

This ruling was followed in *Parrott* v. *Byers, 40 Cal. 614,* a well-considered case, and also in *Ervin* v. *Oregon Railway Co., 62 How. Pr. 490,* where the court uses this language: "That the stock of the plaintiff has not been registered is no reason why he should not maintain this action. He is the legal and equitable owner of this stock. The possession by him of the certificate, as owner, gives him a complete title. For certain purposes and for the enjoyment of specific privileges, such as to vote and receive dividends, it may be necessary, as between him and the corporation, that he be registered as a stockholder. But as the absolute owner of the stock he is, to the exclusion of every other person, entitled to prosecute an action for injury to it or to himself as the proprietor thereof."

The contrary holding of the circuit court of the United States, reported in *Brown* v. *Railway Company, 53 Fed. Rep. 889,* seems to me not to be founded on sound reasoning.

These two principal grounds of demurrer are not, in my judgment, well taken.

Another ground of demurrer is based on the vagueness and indefiniteness of the charges of misconduct found in the bill.

It was argued by counsel for the complainant that the bill will stand, even if these charges are eliminated, upon the bare allegation of intention of the defendant's officers to vote upon its own shares.

I think the point is well taken. *Reading* v. *Stover, 32 N. J. Eq. (5 Stew.) 326.*

But, nevertheless, I will consider these charges. After stating the organization of the two corporations, the acquisition by the younger (United States) company of a large amount, stating it, of the older (International) company's stock, the bill proceeds :

"That the persons who owned and controlled and acted with said United States Silver Corporation hold a sufficient amount of the preferred stock of the International Silver Company to make, with the aforesaid stock, a majority of the voting strength of the stock of the International Silver Company ; that the persons then in control of the International Silver Company represented chiefly the preferred stock of said company [which by previous statements in the bill had a double voting capacity] and had been in control of said company since its formation, and your orator is informed and believes that the officers draw large salaries, the salaries of six of the directors now aggregating nearly sixty-five thousand dollars ($65,000) per year, and your orator charges the truth to be that said salaries are excessive and that the services rendered to the said International Silver Company by many of its salaried officers are largely nominal.

"Your orator charges the fact to be that the management of said International Silver Company hitherto has not been sufficiently successful to pay the dividends upon its preferred stock, and said dividends are cumulative, and said dividends were in arrears and unpaid to the amount of about one million dollars ($1,000,000), and scrip has been issued to the preferred stockholders representing such dividends."

The question is, are these allegations sufficiently explicit? The vagueness and indefiniteness is argued to be found in the failure to specify the names of the persons who own and control, &c., enough stock in connection with that owned by the United States, &c., and in not stating the amount so held.

I think such particularity is not required in the pleading when we consider its object and what is common knowledge as to the practice of forming pools of stock to control corporate management. It is enough to state that a majority of the stock of the International, including that held by itself, sufficient to control the company, is held by a combination. Besides, this allegation is supplemented by the statement further on that the officers of the International company had purchased for that

company all the stock of the United States company, and thereby the control of the United States company had passed to the officers and directors of that company, if the stock in question had voting power, and would and could be used to perpetuate their control. It thus appears that the statement of the names of the persons referred to in the first part of the paragraph was wholly immaterial.

So with the designation "officers," in connection with the charge of excessive salaries, clearly it was not necessary to state the names and specific official designation of these persons. That is within the knowledge of the defendant.

The object of these allegations is to show the danger to the stockholders at large of allowing the officers and directors of the corporation to vote on the shares of stock owned by it.

No relief is sought upon these allegations. The object of the bill is to prevent the voting on the shares held by the company. For that purpose, at least, they are abundantly sufficient.

A case illustrative of the rules of this court, as applied to language such as is the subject of this part of the demurrer, is *Mutual Life Insurance Co.* v. *Sturges, 32 N. J. Eq. (5 Stew.) 678.* Vice-Chancellor Van Fleet (at *p. 681,* bottom, and *p. 682,* top) applies the strict rule invoked by the defendant here in the very matter of the names and descriptions of persons, and held that the allegations in that behalf were so indefinite that a decree *pro confesso* based upon them possessed no value as against the defendants, who, though notified, failed to answer. This was tantamount to considering them as on demurrer.

But his view was not adopted by the court of appeals. Justice Depue, speaking for that court, *33 N. J. Eq. (6 Stew.) 328* (at *p. 337*), discusses the question, and says: "I think, even on demurrer, a court would hesitate to adjudge this complaint bad for uncertainty."

I will advise that the demurrer be overruled, upon the usual terms of answering within thirty days, upon payment of costs.