**RICHARDSON et al. v. BLUE GRASS MINING CO. et al.**
No. 858.

District Court, E. D. Kentucky, at Lexington.
Oct. 17, 1939.

W. E. Faulkner and Wootton & Wooton, all of Hazard, Ky., and J. R. Simmonds, of Johnson City, Tenn., for complainants.

S. S. Willis, of Ashland, Ky., and Craft & Stanfill and J. E. Johnson, Jr., both of Hazard, Ky., for defendants.

FORD, District Judge.

The questions presented for determination make it necessary to review a series of transactions, the first of which took place on November 25, 1929, when the Receiver of the Wakenva Coal Company and Amalgamated Coal Corporation, acting under the orders of the Circuit Court of Perry County, Kentucky, offered for sale at public auction a large acreage of coal lands in Perry County upon which extensive mining operations had been carried on for many years. Included in the sale were numerous buildings and other structures such as miners' houses, tipples and trackage located on the land, also coal cutting machines, mine cars, motors and other equipment in the mines and a stock of merchandise and fixtures in the commissary. The defendant, J. E. Johnson, Sr., became the purchaser for the sum of $14,000, his purchase being subject to confirmation by the Court.

In attendance at the sale were two gentlemen from Tennessee, H. T. McArthur and Ferdinand Powell. They were experienced coal mine operators. After looking over the property, they decided to make an effort to purchase an interest in it for themselves and their associates, W. E. Richardson, Mrs. Margaret Powell and R. W. Lawson. Negotiations were begun with the result that on December 7, 1929, Mr. Johnson sold and assigned one-half interest in his purchase to Mr. McArthur as Trustee for himself and his Tennessee associates. For convenience, we shall refer to Mr. McArthur and his associates, the complainants, as the Tennessee group. They paid Mr. Johnson $1,400, covering one-half of the payment he had made to the Receiver; they agreed to pay one-half the remainder of the purchase price in accordance with the terms of the court sale and to pay Mr. Johnson an additional $4,000 if and when the sale was finally confirmed and title vested in them to one-half of the property. The contract evidencing their various agreements was in writing. It provided, in substance, that in the event one or more corporations should be organized to take over and operate the proposed enterprise one-half the stock in each corporation should be owned by Mr. Johnson and the other half by Mr. McArthur and his associates.

The sale was confirmed by the Perry Circuit Court on December 11, 1929, and possession of the property was then delivered to the purchasers by the Receiver.

At about this time, the defendants J. E. Johnson, Jr., and William Pendleton and his brother Arch Pendleton became associated with the defendant J. E. Johnson, Sr., in the undertaking. They will be referred to as the Kentucky group.

On December 16, 1929, representatives of the Tennessee group met with Mr. Johnson and his Kentucky associates in Lexington and definite plans were made for the organization of two corporations. To take over and operate the mines, they incorporated "Blue Grass Mining Company" with a capital stock of $10,000 represented by one hundred shares of par value of $100 each. At the same time, they incorporated "The Pendleton Store" to take over and operate the mine commissary with a capital stock of $5,000 divided into fifty shares of $100 each. The capital stock of both corporations was fully subscribed, representatives of the Tennessee group subscribing for one-half of the stock of each corporation and representatives of the Kentucky group for the other half.

In order to get operations started, it was estimated that $5,000 would be necessary and the Tennessee group paid to Mr. Johnson $2,500 as their share (one-half) of the initial operating capital. Blue Grass Mining Company promptly took over operation of the mines and The Pendleton Store took over the commissary. The mines were put in operation and were ready to ship coal by January 1, 1930. Thereafter the business was carried on diligently. The Kentucky group assumed complete control of both corporations and took active charge of all the business. Mr. J. E. Johnson, Sr., was recognized as in chief authority. Considerable correspondence was carried on with the Tennessee group as the business progressed and operating statements were occasionally mailed to them. Members of the Tennessee group visited the mines and observed the activities from time to time, and on several occasions rendered valuable assistance in solving problems which arose in connection with sales of coal and operations of the mines. The enterprise was so successful that additional contributions by the stockholders were never requested or needed.

On May 30, 1930, the Kentucky Court of Appeals reversed the order of the lower court and directed that the sale be set aside. Wakenva Coal Co. v. Johnson, 234 Ky. 558, 28 S.W.2d 737. The parties, of

course, had anticipated the possibility of this eventuality and had discussed plans to try to lease the property from the Receiver and thereby continue the operation of it until another sale, with the hope that they might again buy it. Under date of June 30th, Mr. Johnson wrote Mr. Powell in reference to the situation, saying: "The only thing that can be done, as I see it, is to make a lease to the Blue Grass Mining Company to take care of it and operate it until it can be sold." The parties concurred in Mr. Johnson's suggestion and on July 7, 1930, with the authority of the Court the Receiver temporarily leased the property to the Blue Grass Mining Company with authority to it to continue operations.

Their efforts to promptly secure a Court order for a second sale and to purchase the property were successful, the purchase price being increased however to $52,000. The Wakenva interest again prosecuted an appeal. Nevertheless all the property remained in the possession of the newly organized corporations and operations were not interrupted by the appeal.

Several months later the Court of Appeal handed down an opinion again reversing the lower court and ordering the sale set aside. Before the mandate was issued a petition for rehearing was filed. While this petition was pending, through the efforts and influence of the Tennessee group, an agreement was reached with the Wakenva interests under which, in consideration of $10,750 paid them by Blue Grass Mining Company, they agreed to withdraw their objections to the sale and dismiss the appeal. As the result of this agreement, the appeal was withdrawn or dismissed, and the order of the Perry Circuit Court confirming the second sale became final.

It appears from the record that between the first and second sales, Blue Grass Mining Company expended $38,800 upon the property in the way of additions and improvements and the Perry Circuit Court allowed it credit on the purchase price for the amount so expended. Notwithstanding these large expenditures on the property and the $10,750 paid to the Wakenva interests in compromise of the suit, in this brief time the company had accumulated such a substantial bank balance that in November 1930 when general conditions throughout the country created uneasiness as to the safety of banks, Mr.

Johnson withdrew $10,000 from the bank account of the company and after holding it in his private bank box for a considerable time paid it to the Receiver on the purchase price of the property. In view of the small outlay of initial capital, these expenditures, aggregating more than $50,000, evidence the large earnings of the business from the beginning.

The complainant, W. E. Richardson, succeeded McArthur as Trustee for the Tennessee group and on February 18, 1931, he was induced to sign a contract with J. E. Johnson, Sr., and J. E. Johnson, Jr., providing, in substance and effect, that the interest of the Tennessee group in the capital stock of Blue Grass Mining Company and The Pendleton Store should be thirty percent and that J. E. Johnson, Sr., "and certain other parties of the State of Kentucky" should have seventy percent, with the further provision that the stock was "to be issued immediately". The contract also provided for the formation of a holding corporation with stock to be held by the parties in the same proportion. This corporation was to take over and hold title to the property which had been acquired, leaving operation of the properties to the existing corporations. It was also provided that the Tennessee group were to have a small interest in the Jeda Coal Company and Black Gold Mining Company, corporations promoted by Mr. Johnson. The Tennessee group was released from any obligation to pay the $4,000 referred to in the contract of December 7, 1929, and it was provided that the $3,900 paid into the enterprise by the Tennessee group would be refunded to them and $7,500 refunded to Mr. Johnson. They agreed that in the event of the organization of a separate corporation to handle and promote sales the stock would be owned equally by the parties.

Nothing was done to carry out or consummate this second agreement. The business was continued as theretofore with the Kentucky group in complete control. Finally in June 1935 the Tennessee group, having become dissatisfied with the way things were going, employed an accountant to make an audit of the books and records of the corporations.

The report of the auditor disclosed that entries had been made upon the books of both corporations allotting the entire capital stock of both of them to the Kentucky group to the entire exclusion of the Ten-

nessee group. A sales corporation had been organized, known as Blue Grass Coal Company, with capital stock of $5,000 entered upon the books in the name of J. E. Johnson, Sr., his son Mark Johnson, and W. S. Denham, the sales manager.

It was further disclosed that the Kentucky group had withdrawn large sums for salaries and expenses; that substantial payments had been made to their relatives; that they had taken title in their own names to certain lands in which the company was interested and were collecting royalties from the company; that they had used the funds and credit of the companies to finance their individual enterprises and had engaged in various other questionable transactions in connection with the business.

A meeting of the two groups was attempted at Lexington on February 8, 1936, but due to their inability to agree as to their respective rights in the corporations nothing was accomplished and this litigation ensued.

■ Claiming to be entitled to one-half the capital stock of each of the corporations referred to, the plaintiffs, the Tennessee group, seek (1) to have their rights as such stockholders adjudicated, and (2) on behalf of the corporations involved they seek to secure from the defendants, the Kentucky group, certain relief, to which they claim the corporations are entitled on account of alleged misconduct and breaches of trust charged to have been committed by them in handling the business and affairs of the corporations. The propriety of joining claims of this character in a single action seems to be clearly recognized in Rule 18(b) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, providing "Whenever a claim is one heretofore cognizable only after another claim has been prosecuted to a conclusion, the two claims may be joined in a single action."

■ Before dealing with the merits, the contention by the defendants that the Court is without jurisdiction must be disposed of. Complainants invoke Federal jurisdiction on the ground that this is a suit of a civil nature where the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000 and is between citizens of different states. Judicial Code, § 24, 28 U.S.C.A. § 41. That the value of the matter in controversy exceeds the statutory requirement is not questioned. The defendants contend, however, that since one of the purposes of the suit is to secure relief on behalf of the corporate defendants, under the rule that, for the purpose of determining jurisdiction, the parties, notwithstanding their position upon the face of the pleadings, should be realligned according to their real interest in the controversy, it is necessary to treat the Kentucky corporate defendants as complainants and that such reallignment would place citizens of Kentucky on both sides of the controversy, thereby destroying the complete diversity of citizenship between the parties required by the Statute. The allegations of the complaint are sufficient to fulfill the requirements of both the former Equity Rule 27, 28 U.S.C.A. following section 723, which was in force when the suit was filed, and the present Rule 23(b) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Although the ultimate interest of the corporate defendants in respect to certain features of the suit may be the same as the complainants, it is adequately shown that the corporations are and at all times have been under the control and domination of the Kentucky group, the alleged wrongdoers. In the case of Doctor v. Harrington, 196 U.S. 579, 587, 25 S.Ct. 355, 357, 49 L.Ed. 606, the same character of reallignment of the parties was sought in order to defeat Federal jurisdiction of a suit brought by a stockholder founded upon rights which might properly have been asserted by the defendant corporation. The Court said: "The ultimate interest of the corporation made defendant may be the same as that of the stockholder made plaintiff; but the corporation may be under a control antagonistic to him, and made to act in a way detrimental to his rights. In other words, his interests, and the interests of the corporation, may be made subservient to some illegal purpose. If a controversy hence arise, and the other conditions of jurisdiction exist, it can be litigated in a Federal court." This case seems controlling upon the point. The corporations were properly made defendants and all conditions requisite to Federal jurisdiction are shown to exist.

Turning to the merits of the case, the first question to be decided is whether the complainants, the Tennessee group, are entitled to any part of the capital stock of the corporations involved and if so the extent of their interest.

It is insisted by the defendants, the Kentucky group, that the action of the

Court of Appeals in setting aside the first sale resulted in divesting the Tennessee group of all rights and interests in the stock of the corporations and that the only rights which the Tennessee group thereafter had in them were such as they acquired by virtue of the contract of February 18, 1931, and, having repudiated the latter contract, they are now without right to any of the relief sought herein.

There is nothing in the record to indicate that the corporations were not organized in full compliance with the governing statutory provisions. Neither their corporate existence nor the rights or obligations arising from the stock subscriptions were conditional or contingent upon favorable action by the Court of Appeals in the pending litigation. It is shown that each group, in good faith, through their respective representatives, subscribed for fifty percent of the stock of the corporations. In addition to their first payment of $1,400, the Tennessee group paid $2,500, covering their share of the amount called for to provide working capital. Upon the capital so provided, both corporations began and successfully carried on the business for which they were organized. They accumulated assets so rapidly and to such an extent that no further calls were ever made upon the stock subscribers for additional capital stock payments. As between themselves, no corporate creditors or other parties being concerned, the rights of each group as stockholders to the extent of fifty percent of the capital stock of each corporation thus became fixed. Kentucky Statutes, §§ 542, 543; Smith v. Gower, 63 Ky. 17, 2 Duv. 17; Instone v. Frankfort Bridge Co., 5 Ky. 576, 2 Bibb 576, 5 Am.Dec. 638; Fry's Executor v. Lexington Ry. Co., 59 Ky. 314, 2 Metc. 314; Burchett v. Louisa Light & Power Co., 235 Ky. 296, 31 S.W.2d 373.

The evidence is convincing that Mr. Richardson, as Trustee for the Tennessee group, was induced to enter into the contract of February 18, 1931, by materially false and fraudulent representations. These representations were, in substance, that Mr. H. K. English, a prominent and influential coal mine operator of Eastern Kentucky, had threatened to be a competitive bidder at the second sale of the property and in order to avoid the danger of this interference with their plans for the purchase of the property it was agreed to permit Mr. English to have forty percent of the stock of the corporations and hence it was necessary for each group to relinquish twenty percent of the stock so that the demands of Mr. English could be met. The testimony of Mr. English shows that these representations were entirely without foundation in fact.

Furthermore, the subsequent conduct of Mr. Johnson and his associates constituted not only breach but complete abandonment of the 1931 contract. They attempted to appropriate all of the stock to themselves, without notice to the Tennessee group. In numerous other ways they revealed a deliberate design to deprive their Tennessee associates of all beneficial interest in the corporations. After the coal resources of the properties had been depleted by more than five years of intensive operations, the profits from which had been almost entirely appropriated by the Kentucky group, they demanded that the Tennessee group participate in the meeting of February 1936 at Lexington only upon the basis of a thirty percent interest under the terms of the contract of 1931. Under such circumstances the Tennessee group were thoroughly justified in refusing to recognize the 1931 contract as controlling or binding upon them in any respect.

A total of $10,000 was credited to the Kentucky group on the books of the affiliated corporations as stock dividends, of which they were paid $1,600 leaving $8,400 standing on the books as "notes payable", although, so far as the record shows no notes were ever executed by either corporation. To the end that the Tennessee group may receive their rightful share of these dividends, the complainant, W. E. Richardson, as Trustee for the Tennessee group, is entitled to judgment against the Kentucky group for one-half the amount of dividends paid to them, with interest from the date of payment, and he is further entitled to have proper entries made on the books of the corporations showing his one-half interest in the remainder designated as "notes payable". If the Tennessee group be properly credited with their share of the "notes payable" and also with the amounts paid by them into the business of the affiliated corporations amounting to $3,900 ($1,400 paid on sale bond and $2,500 for working capital), their stock subscriptions will be more than paid in full. They are entitled to these credits and the books and records of the corporations should be so revised as to reflect the

capital stock account of the Tennessee group accordingly.

The Tennessee group is entitled to one-half of the capital stock of each of the corporations and to have an equal voice with the Kentucky group in the selection of officers and directors and in the determination of all other matters affecting the corporations. Stock certificates evidencing title to 50 shares of the capital stock of Blue Grass Mining Company and 25 shares of the capital stock of The Pendleton Store should be issued in the name of W. E. Richardson as Trustee for the Tennessee group.

The record shows that Blue Grass Mining Company is the beneficial owner and entitled to all rights and interests acquired in the name of J. E. Johnson, Jr., at the sale made by the Receiver on October 27th and December 22nd, 1930. Appropriate orders should be entered requiring J. E. Johnson, Jr., to assign and transfer these rights to the corporation so that steps may be promptly taken to close the proceedings pending in the State Court and to vest title in the corporation.

The other branch of the case is in the nature of a stockholders' bill to enforce corporate rights and recover corporate assets in regard to which the corporations are unwilling or unable to act for themselves. The right of stockholders to maintain such an action under former Equity Rule 27, now Rule 23(b) of Rules of Civil Procedure, is not disputed. The only question is whether the complainants have shown themselves to be "stockholders" within the meaning of the rule. It is established that the complainants are, and at the time of the institution of this action were, entitled to fifty percent of the capital stock of the corporations on behalf of which they seek to maintain the action. Some authorities hold that only a stockholder of record is qualified to maintain such a derivative suit, but the weight of authority seems to be that the owner of an equitable interest in corporate stock is likewise entitled to maintain the action. Support for this view is found in Willcox et al. v. Harriman Securities Corp. et al., D.C., 10 F.Supp. 532; Backus v. Finkelstein, D.C., 23 F.2d 531; Price v. Union Land Company, 8 Cir., 187 F. 886. An interesting discussion of the point may be found in the opinion of Chancellor Pitney in O'Connor v. International Silver Company, 68 N.J. Eq. 67, 59 A. 321. In Arcola Sugar Mills Co. v. Burnham, 5 Cir., 67 F.2d 981, it was held that the equitable interest of a mere pledgee qualified him under the rule to maintain such an action.

Whether the Kentucky group were de jure or de facto officers and directors of the corporations is immaterial. Their fiduciary relation to the corporations is the same in either case. The material fact is they dominated and controlled the corporations in all respects. It is fundamental that persons in complete charge and control of a corporation, as managing agents or officers, occupy a fiduciary relation and such a trust carries with it the duty of exercising a high degree of good faith, care and diligence for the protection of the corporation and the promotion of its interests. Every act in their own interest to the detriment of the corporation under their control becomes a breach of trust for which they should be held to strict accountability in a court of equity. Hyams v. Calumet and Hecla Mining Company, 6 Cir., 221 F. 529, 537; Ashman v. Miller, 6 Cir., 101 F.2d 85, 91.

The defendants insist that the complainants have delayed asserting their claims so long that their laches is a bar to the relief sought. It is true that the familiar maxim "Equity aids the vigilant, not those who slumber on their rights", furnishes an important rule to prevent the enforcement of stale demands independent of statutory periods of limitations. Mere lapse of time, however, is not the only element to be considered in applying the rule. A more important consideration is whether delay in asserting the claim has worked such prejudice or disadvantage to parties adversely interested or such changed conditions have occurred in the mean time that enforcement of the claim is rendered inequitable. There is no fixed rule by which to measure the degree of laches which is sufficient to bar the enforcement of a right. Each case must be determined according to its own particular facts and circumstances. Northern Pacific R. Co. v. Boyd, 228 U.S. 482, 509, 33 S.Ct. 554, 57 L.Ed. 931; Townsend v. Vanderwerker, 160 U.S. 171, 16 S.Ct. 258, 40 L.Ed. 383. Where the parties sustained a confidential relation to each other, and the claim arises from an alleged breach of trust, or fraud is imputed, in the interest of justice a Court of equity will look upon delay with much more indulgence. McIntire v. Pryor, 173 U.S. 38, 53, 19 S.Ct. 352, 43 L.Ed. 606; Kilbourn

v. Sunderland, 130 U.S. 505, 518, 9 S.Ct. 594, 32 L.Ed. 1005. It is sufficient to say that in the light of the facts disclosed by this record, it does not appear that complainants have been guilty of unreasonable delay or that defendants have suffered such prejudice or disadvantage on account thereof as to make enforcement of the demands inequitable. The defense of laches is without merit.

The numerous claims asserted against the Kentucky group on behalf of the corporations remain for consideration.

(1) N. C. Crawford was the owner of a tract of valuable coal land adjacent to the land of Blue Grass Mining Company. The widow and heirs of John Baker owned a small tract which was entirely surrounded by the operations of the company. The evidence shows that the acquisition of the minerals underlying these lands and the mining rights thereto would have been advantageous to the Company. In December 1933 the Baker tract was purchased for Six Hundred Dollars ($600) and the title taken in the name of the defendant William Pendleton. It appears from the auditor's report that to March 31, 1937, Mr. Pendleton received from the Company and divided with his associates, J. E. Johnson, Sr., J. E. Johnson, Jr., and Arch Pendleton more than $5,000 in royalties for coal mined from this tract. In May 1935 the Crawford tract was purchased. Although the cost of acquiring this property, $9,020, was paid from the funds of the Company, the title was taken in the name of J. E. Johnson, Sr. The cost was repaid to the Company in October 1936, but without interest. At the close of the audit, March 31, 1937, Johnson and Pendleton had received credit on the books of the Company for royalties on account of coal mined from this tract aggregating more than $7,000. J. E. Johnson, Sr., J. E. Johnson, Jr., and William Pendleton also purchased from various owners royalty rights under the Combs-Wells-Eversole lease to the Company. In each of these transactions, the Kentucky group clearly sought to serve their own interests by gaining profits for themselves at the expense of the corporation. In so doing, they violated the trust imposed upon them as the controlling and dominating agents of the corporation whose interest it was their duty to serve and protect. They should be required to convey to Blue Grass Mining Company any and all interest which they or either of them acquired in the Crawford land, the Baker land and the royalties under the Combs-Wells-Eversole lease; and on behalf of Blue Grass Mining Company the complainants are entitled to recover from them jointly and severally all royalties paid to or received by them or either of them from the company on account of these transactions, together with legal interest upon each payment from the date thereof, subject to be credited however with the amounts paid by them or either of them in acquiring the property with interest from the date of payment.

The report of the auditor does not show the royalties paid or credited on account of these properties since March 31, 1937, and the record does not show definitely the amounts expended in acquiring the royalties under the Combs-Wells-Eversole lease. It will be necessary, therefore, to appoint a special master to ascertain and report the amount due the Company on account of these transactions unless the parties are able to stipulate as to the items involved in the accounting, on the basis indicated.

(2) It appears from the evidence that from the beginning of the association of the Kentucky and Tennessee groups in these enterprises they considered from time to time the advisability of organizing a subsidiary corporation to act as a sales agency for the marketing of the coal produced by the Blue Grass Mining Company. In 1932, without notice to the Tennessee group, the Kentucky group caused a corporation to be formed, known as "Blue Grass Coal Company", with a capital stock of $5,000 represented by 50 shares of the par value of $100 each. William Pendleton, J. E. Johnson, Jr., and G. M. Johnson signed the articles of incorporation and represented themselves as the subscribers for all of the capital stock. The books of the corporation, however, indicate that the stock of this company was allotted to J. E. Johnson, Sr., 30 shares, Mark Johnson 10 shares and W. S. Denham 10 shares. From its organization, the company acted as the sales agent for Blue Grass Mining Company and to some extent served other corporations promoted by the defendants in the same capacity. It kept an office in Cincinnati in charge of W. S. Denham and Mark Johnson. Such financing as was needed for this sales agency corporation was provided by Blue Grass Mining Company. Neither of the ostensible stockhold-

ers J. E. Johnson, Sr., Mark Johnson or W. S. Denham actually paid any funds into the Company. Obviously, the book entries in this respect were for the purpose of qualifying them to carry on the corporate business. The plan and purpose of this company is stated in the testimony of J. E. Johnson, Sr., as follows:

"1172. And isn't it a fact that it was not contemplated that the stockholders of the Blue Grass Coal Company would ever enjoy anything as stockholders, but that the Blue Grass Coal Company was merely a selling agency for the mining companies, that if it lost money, the mining companies would put up the loss, and that if it made money, the mining companies would get it? A. That is the way we figured it.

"1173. You handled it that way from the beginning? A. Yes, sir." (Vol. VII, p. 2298.)

The Blue Grass Mining Company is entitled to be adjudged the owner of all the capital stock of Blue Grass Coal Company, and the directors of Blue Grass Mining Company are entitled to exercise all rights incident thereto. The entries on the records of the company showing the stock to be owned by J. E. Johnson, Sr., Mark Johnson and W. S. Denham and corresponding entries showing charges against them on account thereof should be canceled.

▮▮▮▮▮ (3) It appears from the auditor's report that on December 31, 1932, $79 of the funds of Blue Grass Mining Company were used to pay a tavern license, an enterprise in which the company had no interest and which was operated by one of the members of the Kentucky group. It also appears that on December 31, 1936, the Kentucky group caused the sum of $1,700 to be paid as legal fees for counsel representing them in this cause. Each of these payments were for the personal benefit of one or more of the Kentucky group, and Blue Grass Mining Company is entitled to recover both payments with interest from the date thereof.

▮▮▮▮ (4) In February, 1932, a check for $1,000 was drawn by Blue Grass Mining Company in favor of the complainant, M. T. McArthur, one of the Tennessee group, purporting to be on account of salary. Mr. McArthur did not regard himself entitled to any salary and he endorsed and delivered the check to J. E. Johnson, Sr., with the understanding that it would be re-

turned to the Company. In endeavoring to account for the proceeds of this check, Mr. Johnson first claimed that it went to make up a payment of $3,000 on the sale bond of the company, $2,000 of which he furnished personally. It was later shown that the payment of $3,000 made by Mr. Johnson on the sale bond took place more than seven months before he received the McArthur check, and thereupon Mr. Johnson claimed that he retained it to reimburse himself, in part, for the payment of the $3,000 referred to. It appears from the testimony of Mr. W. E. Davis, Receiver for the Wakenva properties, that within a short time after the mandate of the Court of Appeals was issued in 1930 setting aside the original sale, he refunded to Mr. Johnson the $2,800 which had been paid on the first sale bond, $1,400 of which was furnished by the Tennessee group. Mr. Johnson made no refund of any part of this collection to the Tennessee group and obviously at the time he made the payment of $3,000 on the second bond in June 1930 he used the $2,800 which he had collected from the Receiver. It seems clear, therefore, that he is not entitled to take credit for more than $200 on account of the McArthur check to make up the payment on the bond; thus leaving a balance of $800 of the McArthur check unaccounted for. Blue Grass Mining Company is entitled to recover from J. E. Johnson, Sr., $800 on account of this item with interest from the date it was received by him.

▮▮▮ (5) It is claimed that J. E. Johnson, Sr., should account to the Company for interest on the $10,000 which he withdrew from the bank account of Blue Grass Mining Company in November 1930 and retained in his possession in his private bank box until June 1931 when it was applied on the sale bond. There is nothing in the evidence to indicate that Mr. Johnson used this fund for his own benefit; on the other hand, it appears that he retained it only for the purpose of safeguarding it during the period of banking difficulties which prevailed at the time. The claim for interest on this fund should be denied.

The circumstances are not the same, however, in reference to Mr. Johnson's withdrawal of $5,000 from the insurance fund of the Company in 1936. There being no evidence to the contrary, I am forced to the conclusion that Mr. Johnson used this withdrawal for his own personal benefit during the time he had it and he should

be required to account for interest upon it from the time of the withdrawal until it was repaid.

(6) In 1931, the defendant, J. E. Johnson, Sr., together with W. E. Davis and H. K. English, organized two corporations known as Jeda Coal Corporation and Black Gold Mining Company, hereinafter referred to as "Jeda" and "Black Gold". It appears that J. E. Johnson, Jr., and William Pendleton were also interested in these corporations. Jeda secured mineral rights in certain coal lands from the Hazard Coal Corporation and subleased these lands to Black Gold to operate. Mr. Johnson, Mr. English and Mr. Davis, upon their personal note, borrowed $10,000 from Hazard Coal Corporation, and Mr. Johnson furnished an additional $5,000 in cash. This $15,000 constituted the working capital for these corporations. The corporations also held as capital assets two notes of $5,000 each, one executed by Mr. English and the other by Mr. Davis. From the operations of these companies, J. E. Johnson, Sr., J. E. Johnson, Jr., and William Pendleton received substantial annual salaries. They caused Blue Grass Mining Company to make substantial advancements and extend large credits to Black Gold to meet its payrolls and other obligations from time to time. On account of the loans and credits which the Kentucky group thus caused Blue Grass Mining Company to extend in aid of Jeda and Black Gold, the complainants insist that, under settled rules of equity governing the wrongful use of trust property by trustees for their personal benefit, Blue Grass Mining Company should be adjudged to be the owner of Black Gold and Jeda, and that the Kentucky group should be required to account to Blue Grass Mining Company for all salaries which they or either of them received from them. Such use of the assets of Blue Grass Mining Company was clearly wrong and indefensible, but the evidence shows that for all services rendered and credit extended to Jeda and Black Gold, Blue Grass Mining Company has been fully paid and that all loans or advancements made have been repaid with interest. While it is true that the aid received from Blue Grass Mining Company was a substantial advantage to the Kentucky group in promoting their interests in Black Gold and Jeda, the claim that these corporations were financed entirely by Blue Grass Mining Company is not sustained by the evidence. Blue Grass Mining Company appears to have suffered no actual loss on account of any of these transactions. The claim to ownership of Black Gold and Jeda and for an accounting of salaries paid by them, asserted on behalf of Blue Grass Mining Company, should be denied. For the same reasons the claim that Blue Grass Mining Company is entitled to recover an alleged bonus paid by Black Gold to its commissary manager, H. P. Pendleton, is denied.

(7) It appears from the auditor's report that in 1936 Ed Johnson and Mark Johnson, sons of J. E. Johnson, Sr., were employed by Blue Grass Coal Company at fixed salaries and that, in addition to their salaries, credit was entered on the books of the Company in favor of Ed Johnson in the sum of $2,800 and a like credit in favor of Mark Johnson in the sum of $2,100. It further appears that W. G. McKinney, brother in law of the defendant, William Pendleton, was employed by The Pendleton Store at a fixed salary, and in 1935 he was paid an additional $1,000. Each of these payments was in the nature of a bonus for past services.

It is not within the power of officers or agents of a corporation to thus give away corporate assets. In the absence of a showing of formal action by stockholders authorizing such payment and a further showing of a valid contract providing for such payment upon a basis having a proper relation to the value of the service for which it is given, a bonus for past services constitutes an unlawful dissipation of corporate assets for which the managing officers are responsible to the corporation. The evidence is insufficient to establish either of the conditions requisite to validation of these bonuses. See Rogers v. Hill, 289 U.S. 582, 53 S.Ct. 731, 77 L.Ed. 1385, 88 A.L.R. 744. Prior to the close of the audit, neither Ed Johnson nor Mark Johnson had withdrawn or received any part of the bonuses entered to their credit, but the bonus of McKinney was paid to him. The bonuses credited to Ed and Mark Johnson should be canceled on the books, and The Pendleton Store is entitled to recover from the defendants, the Kentucky group, the $1,000 bonus paid to W. G. McKinney with interest from the date of the payment. The same rule is applicable to a similar bonus shown by a credit item of $900 entered on the books

of Blue Grass Mining Company in favor of Ed Johnson in 1935, of which $242.36 appears to have been paid to him, leaving a credit balance of $657.64. The credit balance standing on the books should be canceled and the Company is entitled to recover the amount paid.

■ The payments of $200 to Miss Bertha Pendleton and $900.00 per year for the years 1933–34–35–36 to Mrs. Christine Johnson McBrayer were not bonus payments but were for services rendered under circumstances giving rise to an implied contract in the case of Miss Pendleton and an express contract as to Mrs. McBrayer. The rule applicable to bonus payments does not apply to them.

(8) Coal was sold by Blue Grass Mining Company to B. & B. Ice & Coal Company of Louisville and an arrangement was made by which several automobiles were taken in payment. These automobiles were taken over by the Kentucky group and members of their families. It appears, however, that each of these automobiles was properly accounted for and the claims asserted by the complainants in respect to them are not sustained by the evidence.

■ (9) With the full knowledge of all interested parties, including the Tennessee group, Blue Grass Mining Company procured a life insurance policy for $25,000 to be issued by the Atlantic Life Insurance Company upon the life of the defendant J. E. Johnson, Sr., and has paid the premiums for many years. Although upon the face of the policy, the estate of Mr. Johnson was the beneficiary, it was clearly understood that Blue Grass Mining Company was the sole beneficiary of the policy. It appears that the failure to make proper endorsements to that effect on the face of the policy was due to no purpose on the part of Mr. Johnson to claim the benefit of it, but rather to inadvertence or neglect. The claim that the premiums should be recovered from Mr. Johnson is denied upon the condition, however, that he forthwith take such steps as are necessary to properly evidence the rights of Blue Grass Mining Company as the sole beneficiary under the policy.

■ (10) The following claims asserted on behalf of Blue Grass Mining Company are not sustained by the evidence and should be denied, viz: the claim arising out of the account with the Chavies Coal Company; the claim involving the purchase of equipment from Jackson Fourseam Coal Company; the claim on account of alleged excess payments on the sale bond; the claim for loss in the Hunter Distillery stock, and the McDonald Coal Company account. As to the claim that the Kentucky group should be required to indemnify the corporations against loss on account of interest or penalties which may hereafter be imposed upon the corporations for failure to make proper tax returns, it is sufficient to say that in the absence of a clear showing that such loss is impending as the result of culpable acts of the defendants, the requirement of such indemnity is not warranted.

(11) It appears from the record that during the period of seven years covered by the audit of the books of Blue Grass Mining Company and The Pendleton Store, the total salaries received by each of the members of the Kentucky group from the affiliated corporations, after eliminating the items on account of stock allotments, were as follows: J. E. Johnson, Sr., $42,500. Willian Pendleton, $48,750. J. E. Johnson, Jr., $35,700. Arch Pendleton, $34,000. While the complainants concede that William Pendleton was entitled to a salary of $300 per month under an alleged agreement and that Arch Pendleton was entitled to reasonable compensation for the services actually rendered by him, they contend that all payments to J. E. Johnson, Sr., and J. E. Johnson, Jr., as compensation for services were unlawful and that the full amount thereof is recoverable on behalf of the corporations for the reasons: "(1) because these men usurped the offices of directors and officers; (2) because said salaries were allowed and paid by themselves to themselves without corporate authority, secretly and without the knowledge or consent of their co-stockholders or co-adventurers, and (3) because they occupied fiduciary relations to the corporations and to the Tennessee group as their co-stockholders or co-adventurers, and have been throughout unfaithful to their trust and have forfeited all right to compensation." (Complainants' brief on accounting, p. 3.)

■ From the beginning of the joint enterprise, it was clearly and definitely understood by the Tennessee group that the members of the Kentucky group were to assume the active direction and management of both corporations and that they were to receive reasonable compensation for their services from corporate funds.

The evidence leaves no room for doubt that the members of the Tennessee group were aware at all times of the nature and extent of the onerous services which the members of the Kentucky group were engaged in performing and that salaries were being paid to them, although they may not have been fully informed as to the amounts of the withdrawals on this account until the books were audited. The alleged agreement limiting the salary of William Pendleton to $300 per month is not sustained by the preponderance of the evidence. Prior to the audit, the confidence of the Tennessee group in Mr. Johnson was such that they seemed to be content to leave all such matters to his discretion. The charge that the Kentucky group usurped the functions of directors and officers and compensated themselves for their services "secretly and without the knowledge or consent of their co-stockholders or co-adventurers" is not sustained by the evidence.

■■ The question as to whether the Johnsons forfeited all right to compensation for their services by reason of breach of their fiduciary duties to the corporations and to the Tennessee group as their co-stockholders is a troublesome one and demands careful consideration. The general rule that trustees who are faithless and dishonest in the performance of the duties of their trust forfeit all right to compensation is well established and it applies to managing officers and agents of a corporation as well as to other persons acting in a fiduciary relation. Munro v. Smith, 1 Cir., 259 F. 1; Backus v. Finkelstein, D.C., 23 F. 2d 357; Flint River Pecan Co. v. Fry, 5 Cir., 29 F.2d 457; Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1; and Comingor v. Louisville Trust Company, 128 Ky. 697, 108 S.W. 950, 111 S.W. 681, 129 Am.St.Rep. 322. This rule is not so rigid and inflexible, however, as to leave no room for the exercise of judicial discretion. 65 C.J. § 840, pp. 930, 931. "Fortunately, there is no unbending rule which a court of equity is bound, under all circumstances, to apply in cases of this kind; but that may be done which in good conscience ought to be done in each particular case." Appeal of Biddle et al., 129 Pa. 26, 18 A. 474, 475.

In Pierce v. Dahlgren, 6 Cir., 300 F. 268, 272, the court allowed the trustee her full claim for compensation amounting to $8,000 notwithstanding her misconduct in lending the trust funds to herself and her brother. The Court said: "We find no inflexible rule that to make unlawful loans is to forfeit compensation. That is the usual result; but there is room for the exercise of judicial discretion. Garesche v. Levering Co., 146 Mo. 436, 454, 48 S.W. 653, 46 L.R.A. 232; Myers' Appeal, 62 Pa. 104."

In the case of Paducah Land, Coal & Iron Co. v. Hays, 24 S.W. 237, 15 Ky.Law Rep. 517, the president of a corporation sued to recover his salary. The defense, in part, was based upon the charge that he had failed to account for the proceeds of stock which he had sold for the company and had failed to pay for certain stock which he had taken for himself and, hence, had forfeited his right to the salary claimed. The Kentucky Court of Appeals found the plaintiff at fault for having failed to pay for the stock and required a full accounting by him. Nevertheless, he was adjudged entitled to recover his full salary.

■■ During a period when many other enterprises of the same character sustained heavy losses or failed completely, the corporations here involved appear to have grown and prospered to an extent which seems really phenomenal. Obviously, this extraordinary development was due, in a large measure, to the experience, diligence and prudent supervision of J. E. Johnson, Sr. Efficient services rendered by the other members of the Kentucky group materially contributed to the successful achievement. The services so rendered extended far beyond those of a routine or perfunctory nature ordinarily expected of officers serving without pay. The Tennessee group acquiesced in the rendering of these services and as stockholders share in the benefits derived from them. These facts are amply sufficient to repel any presumption that they were to be rendered gratuitously. Fitzgerald Construction Co. v. Fitzgerald, 137 U.S. 98, 11 S.Ct. 36, 34 L.Ed. 608; Vaught v. Charleston National Bank, 10 Cir., 62 F.2d 817; Paine v. Kentucky Refining Company, 159 Ky. 270, 167 S.W. 375, Ann.Cas.1915D, 389.

For their derelictions, the Kentucky group must make full restitution. To further penalize them by denial of reasonable compensation for the vast amount of labor and beneficial service they rendered, through which the assets of the corporations have been greatly increased and their stockholders substantially enriched, would seem inequitable and unjust. In determin-

ing the compensation fairly allowable to the Kentucky group, however, the fact should not be overlooked that during the same period they received substantial emoluments from their other enterprises, Jeda and Black Gold, which were largely sustained and made fruitful through the financial aid and other assistance received from Blue Grass Mining Company. Considering the nature and extent of the services rendered by each of them, the results accomplished and the entire picture revealed by the record, my conclusion is that for all services rendered to the affiliated corporations during the seven year period ending March 1, 1937, the members of the Kentucky group were entitled to compensation in the following amounts: J. E. Johnson, Sr., $5,000 per annum, or a total of $35,-000; William Pendleton, $4,800 per annum, or a total of $33,600; J. E. Johnson, Jr., $2,400 per annum, or a total of $16,800; Arch Pendleton, $3,000 per annum, or a total of $21,000. The result is the corporations are entitled to recover the sum of $7,500 on account of excess salary paid J. E. Johnson, Sr.; the sum of $15,150 on account of excess salary paid William Pendleton; the sum of $18,900 on account of excess salary paid J. E. Johnson, Jr., and the sum of $13,000 on account of excess salary paid to Arch Pendleton. The amount of the recovery in favor of each of the corporations should be in proportion to the amount of salary withdrawn from them respectively as shown by the auditor's report.

Arch Pendleton appears to have had no part in the management of Blue Grass Mining Company. His participation was limited to acting as one of the directing officers of The Pendleton Store. All recoveries hereunder in favor of Blue Grass Mining Company should be adjudged against J. E. Johnson, Sr., J. E. Johnson Jr., and William Pendleton jointly and severally, while the amounts recoverable by The Pendleton Store should be adjudged against all members of the Kentucky group.

The report of the auditor shows that there is a balance due J. E. Johnson, Jr., from Blue Grass Mining Company on account of expenditures in the purchase of certain prior claims standing against the property in the receivership proceedings in the State Court, amounting to $9,373.12. (See testimony of the auditor, R. Vol. V, pp. 1668, 1669). Obviously, the judgment in favor of Blue Grass Mining Company should be credited by this amount when proper assignment of the claims is made to the Company.

The case will be retained upon the docket for such further steps as may be necessary for the enforcement of the judgment herein entered and for such other orders and proceedings as may be necessary and proper.

Let findings of fact and conclusions of law and judgment in conformity herewith be submitted for entry.